983 A.2d 408

**Nathan SHENKER, et al.**

v.

**LAUREATE EDUCATION, INC., et al.**

**No. 8, Sept. Term, 2009.**

Court of Appeals of Maryland.

Nov. 12, 2009.

318

322

324

Charles J. Piven, David Brower (Brower Piven, Baltimore), on brief, for Petitioners.

David Clarke, Jr. (Sara Z. Moghadam, DLA Piper LLP (US), David J. Cynamon, Alvin Dunn, Pillsbury, Winthrop, Shaw, Pittman, LLP, Washington, DC, Eric A. Kuwana, Catherine S. Wood, Katten, Muchin, Rosenman LLP, Washington, DC Mark D. Gately, Scott R. Haiber, Hogan & Hartson, LLP, Baltimore), on brief, for Respondents.

John B. Isbister, Gregory M. Garrett, Tydings & Rosenberg, LLP, Baltimore, Amici Curiae.

Argued before BELL, C.J. HARRELL, BATTAGLIA, GREENE, MURPHY, JOHN C. ELDRIDGE, (Retired, Specially Assigned), and IRMA S. RAKER, (Retired, Specially Assigned), JJ.

HARRELL, J.

This case is about certain modalities of accountability in a corporate business setting.

Petitioners are shareholders [1] of Laureate Education, Inc. ("Laureate"), a successful publicly-held Maryland corporation headquartered in Baltimore. Laureate's primary business is licensing its educational technology overseas and acquiring management interests in foreign colleges and universities. During 2006 and 2007, Laureate underwent a private acquisition process whereby certain members of Laureate's Board of Directors, namely, Board Respondents Douglas L. Becker and R. Christopher Hoehn–Saric, and several private equity investors ("Investor Respondents"),[2] purchased Laureate through a cash-out merger transaction.[3] Petitioners challenged the

---

1. Petitioners brought this action on behalf of themselves and all other public shareholders of Laureate Education Inc.

2. Investor Respondents, as defined by the Circuit Court for Baltimore City in its 11 May 2007 order of dismissal of this litigation, are Bregal Investments, Caisse de Depot et Placement du Quebec, Citigroup Private Equity, Kohlberg Kravis Roberts & Co., Makena Capital, SAC Capital Management LLC, Southern Cross Capital, and SPG Partners LLC. As noted by the Court of Special Appeals in its unreported opinion in this case, Petitioners did not name Sterling Capital, a defendant to which the 11 May 2007 order of dismissal did not apply, as a defendant in their Second Amended Complaint. Therefore, Petitioners abandoned their claim against Sterling Capital, notwithstanding the Circuit Court's deferral of action on Sterling's motion to dismiss. *See Shapiro v. Sherwood*, 254 Md. 235, 238–39, 254 A.2d 357, 359 (1969).

3. Generally, in a cash-out (or freeze-out) merger transaction, the majority shareholder (or shareholders) of the target company seeks to gain ownership of the remaining shares in the target company. This is accomplished by incorporating an acquiring company to purchase for

transaction in the Circuit Court for Baltimore City on the grounds that, during the process of negotiations between the Board and the erstwhile purchasers regarding the price Laureate's shareholders would receive in the cash-out merger transaction, (1) the Laureate Board of Directors (the "Board Respondents")[4] breached the fiduciary duties they owed to Petitioners as shareholders, (2) Board Respondents and Investor Respondents conspired to breach those duties, and (3) Board Respondents and Investor Respondents aided and abetted that breach. Petitioners' action was dismissed, on Respondents' motions, by the Circuit Court principally because it was seen as an impermissible direct shareholder suit. The Court of Special Appeals affirmed.

We must determine, among other things, whether Board Respondents, in the course of negotiating with the acquiring entity the price that Petitioners would receive for their shares in the cash-out merger transaction, owed fiduciary duties directly to Petitioners as shareholders, thus enabling Petitioners, who claim breach of those duties, to bring a direct action against Board Respondents, rather than pursue a derivative action initiative (or demonstrate the futility of such pursuit) on behalf of the corporation. On direct appeal, the Court of Special Appeals held that § 2–405.1[5] of the Corporations and

---

cash the shares of the target company. Due to the majority's controlling position in the target company, it may force any minority shareholders to surrender their shares and accept the cash payment, effectively eliminating their interest in the target company (and leaving them with no subsequent interest in the acquiring company). Such a cash-out merger stands in contrast to a traditional merger, in which shareholders of the target company trade in their shares in exchange for shares in the acquiring company. *See generally* James J. Hanks, Jr., *Maryland Corporation Law* § 9.5 (2006 Supp.).

4. The Board Respondents consist of Laureate Education, Inc., Isabel Aguilera, Wolf H. Hengst, Richard W. Riley, John A. Miller, James H. McGuire, R. William Pollock, David A. Wilson, Douglas L. Becker, and R. Christopher Hoehn–Saric.

5. Section 2–405.1, entitled "Standard of care required of directors," states in pertinent part:

Associations Article[6] bars all direct shareholder claims and affirmed the Circuit Court's dismissal of Petitioners' claims for civil conspiracy and aiding and abetting. For reasons we shall explain, we reverse in part the judgment of the Court of Special Appeals and hold that, where corporate directors exercise non-managerial duties outside the scope of § 2–405.1(a), such as negotiating the price that shareholders will receive for their shares in a cash-out merger transaction, after the decision to sell the corporation already has been made, they remain liable directly to shareholders for any breach of

---

(a) In general.—A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
(1) In good faith;
(2) In a manner he reasonably believes to be in the best interests of the corporation; and
(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

\* \* \*

(c) Liability limited.—A person who performs his duties in accordance with the standard provided in this section shall have the immunity from liability described under § 5–417 of the Courts and Judicial Proceedings Article.
(d) Limitations of duty.—The duty of the directors of a corporation does not require them to:
(1) Accept, recommend, or respond on behalf of the corporation to any proposal by an acquiring person as defined in § 3–801 of this article;

\* \* \*

(5) Act or fail to act solely because of:
(i) The effect the act or failure to act may have on an acquisition or potential acquisition of control of the corporation; or
(ii) The amount or type of any consideration that may be offered or paid to stockholders in an acquisition.
(e) Presumption of satisfaction.—An act of a director of a corporation is presumed to satisfy the standards of subsection (a) of this section.
(f) No higher acquisition duty.—An act of a director relating to or affecting an acquisition or a potential acquisition of control of a corporation may not be subject to a higher duty or greater scrutiny than is applied to any other act of a director.
(g) Limitation on enforceability.—Nothing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation. Md.Code Ann., Corps. & Ass'ns § 2–405.1 (1975, 2007 Repl.Vol.).

6. Unless otherwise noted, all statutory citations contained herein refer to the Corporations and Associations Article.

those fiduciary duties. We affirm that part of the Court of Special Appeals's judgment that upheld the Circuit Court's dismissal of Petitioners' claims against Investor Respondents for civil conspiracy and aiding and abetting.

## I. BACKGROUND

In June 2006, at a regularly scheduled meeting of Laureate's Board of Directors, Board Respondent Becker, Laureate's Chairman and CEO, spoke to the Board about the possibility of exploring a transaction between Laureate and private equity investors that would cause Laureate to "go private." The Board authorized Becker to investigate the potential valuation of Laureate's stock in such a transaction. In August 2006, Becker contacted members of the Board's conflicts committee and requested permission to approach Sterling Capital Partners II, L.P. ("Sterling Capital"), a private equity firm in which Becker held an interest, regarding the proposed transaction. The committee granted permission.

On 8 September 2006, Becker informed the Board that he intended to make an offer to purchase Laureate, at which time the Board created a Special Committee composed of three independent directors, Board Respondents McGuire, Pollock, and Wilson, with the authority to retain independent advisors and make independent assessments of any proposed offers. The Special Committee retained the law firm Pillsbury Winthrop Shaw Pittman LLP as its legal counsel, and Morgan Stanley and Merrill Lynch as its financial advisors.

Three days later, Becker submitted a letter to the Board stating that he and Sterling Capital proposed to acquire Laureate for $55 per share. On 22 September 2006, the Special Committee requested that Becker withdraw his proposal so that an appropriate process or set of procedures could be put into place regarding Becker's development of proposals and the Special Committee's evaluation of those proposals. Becker withdrew the first offer the next day and, on 29 September 2006, the Special Committee adopted a set of procedures intended to govern the due diligence process Beck-

er and other potential financing sources would be required to follow in order to submit an offer.

Becker thereafter submitted a second offer to the Special Committee, on behalf of Investor Respondents (which included Sterling Capital) to purchase Laureate for $60.50 per share. That price constituted an 11.1 % premium over Laureate's then most recently traded stock price. The proposal included a 45–day "go shop" provision which allowed Laureate to solicit other offers, but required that Laureate pay Investor Respondents a $55 million termination fee if it reached an agreement with another acquirer during the go-shop period, or $110 million if it reached such an agreement afterwards. Morgan Stanley and Merrill Lynch concluded that the offer was fair financially, although that conclusion was disputed contemporaneously by several of Laureate's largest institutional shareholders.

The Special Committee unanimously recommended on 28 January 2007 that the Board approve the proposed transaction. The Board unanimously agreed, and Laureate announced the news. Neither Becker nor Hoehn–Saric, another Laureate director who held an interest in Sterling Capital, participated in the Board's meeting that lead to approval of the offer.

On 30 January 2007, Petitioners filed two direct shareholder complaints in the Circuit Court for Baltimore City relating to the proposed merger at the $60.50 per share price. The Circuit Court consolidated the complaints into a single complaint, and Petitioners thereafter filed a Consolidated Amended Complaint on 5 April 2007. That complaint alleged that, during the course of the acquisition, (1) Board Respondents breached the fiduciary duties that they owed to Petitioners as shareholders, (2) Board Respondents and Investor Respondents conspired to breach those fiduciary duties, and (3) Board Respondents and Investor Respondents aided and abetted that breach.

Respondents filed motions to dismiss.[7] On 11 May 2007, the Circuit Court issued an order granting the motion to dismiss of Investor Respondents (excluding Sterling Capital), with prejudice, on the ground that Petitioners had "failed to allege a cognizable duty owed them" by Investor Respondents. The court deferred ruling on the remaining motions.

Laureate announced on 3 June 2007 that it accepted an increased offer from Investor Respondents to acquire Laureate at a price of $62 per share by way of a tender offer and second-step (or "short-form") merger, a process whereby Investor Respondents would purchase, at a price per share equal to the offer price, a number of newly issued shares of Laureate's common stock sufficient to provide the Investor Respondents with ownership of one share more than 90% of the total shares outstanding and then, by virtue of their 90% ownership, convert all remaining shares of Laureate's common stock into the right to receive the same price paid per share in the tender offer.[8] The Special Committee's financial advisors again concluded that the offer was fair financially, but several of Laureate's institutional shareholders disagreed. The Special Committee unanimously recommended that the Board approve the transaction, and the Board, interested Board Respondents Becker and Hoehn–Saric excluded, approved unanimously the transaction. The tender offer commenced on 8 June 2007. On 13 June 2007, Petitioners filed a Second Amended Consolidated Complaint naming Board Respondents

---

**7.** Four such motions were filed. Respectively, those motions were filed by (1) Board Respondents McGuire, Pollock, and Wilson, who were members of the Special Committee overseeing the acquisition; (2) interested Board Respondents Becker and Hoehn–Saric, and Sterling Capital; (3) Investor Respondents, Kohlberg Kravis Roberts & Co., Citigroup Private Equity, S.A.C. Capital Management LLC, SPC Partners LLC, Bregal Investments, Caisse De Depot Et Placement Du Quebec, Makena Capital, and Southern Cross Capital; and (4) the remaining defendants, which included Laureate and other Board Respondents Aguilera, Hengst, Riley, and Miller.

**8.** Petitioners contend that this change of tactic was designed to foreclose a shareholder vote and to ensure that Investor Respondents' acquisition of Laureate closed for the lowest price and as quickly as possible.

as defendants, and alleging but one count-that Board Respondents breached their fiduciary duties owed to Petitioners.[9] On 18 June 2007, Laureate and Board Respondents filed a joint motion to dismiss.

The Circuit Court heard argument on the motion and, on 26 June 2007, granted the motion to dismiss the Second Amended Complaint, with prejudice. In its order, the court stated that Petitioners' claims "suffer from a threshold flaw that is fatal to their efforts," namely that "the vehicle they have chosen to utilize for those purposes, i.e., a direct action against corporate directors for alleged violations of fiduciary duties, is unavailable to them in Maryland." The trial judge based his decision on § 2–405.1(g) of the Corporations and Associations Article, holding that subsection (g) "was enacted to foreclose exactly the kinds of claims which [Petitioners] seek to bring in this action" and that Petitioners should have proceeded by making demand on Laureate or, if demand was futile or excused, by suing derivatively in the right of Laureate. The court also held that Board Respondents' statutory fiduciary duties ran only to Laureate itself and not directly to Petitioners. Finally, the judge held that Petitioners had no basis for their claim that they were being denied unconstitutionally redress for their injuries.

After having their motion for reconsideration of the order of dismissal and a motion for leave to amend the Second Amended Consolidated Complaint denied by the Circuit Court, Petitioners appealed timely to the Court of Special Appeals.

---

**9.** Specifically, Petitioners alleged that Board Respondents, in recommending and accepting the cash-out merger proposal, acted in bad faith, with improper motive, and without due care. They claimed that Board Respondents breached their fiduciary duties to Petitioners by failing to conduct a proper market check to determine the value of Laureate, designing an evaluation process that was riddled with conflict, allowing Board Respondent Becker, an interested director, to lead the process of exploring possible alternatives to the cash-out merger proposal, and issuing to Petitioners a materially misleading 14D–9 form, a document that must be filed with the Securities and Exchange Commission when an interested party makes a solicitation or recommendation statement to shareholders with respect to a tender offer.

The Court of Special Appeals, in an unreported opinion, affirmed the Circuit Court's dismissal of Petitioners' action, holding that directors of Maryland corporations owe no common law fiduciary duties directly to their shareholders and that, in a cash-out merger transaction, any claims shareholders may have against directors for breach of fiduciary duties must be brought derivatively on behalf of the corporation. Specifically, the unanimous panel of the intermediate appellate court concluded that "the plain language of CA § 2–405.1(g) bars Shareholders' direct claim because the words of that subsection, given their ordinary meaning and read in the manner in which they are most commonly understood, provide that shareholder claims against directors for breaches of fiduciary duties may only be pursued by the corporation or derivatively by its shareholders." Based on this conclusion, our appellate brethren upheld the Circuit Court's dismissal of the breach of fiduciary duties claim because it did not state a legally sufficient cause of action.[10]

The Court of Special Appeals also affirmed the Circuit Court's dismissal of Petitioners' civil conspiracy claim against Investor Respondents based on its determination that Investor Respondents did not owe a fiduciary duty to Petitioners and thus were legally incapable of committing the underlying tort of breach of fiduciary duty. Finally, the intermediate appellate court held that the Amended Complaint did not allege sufficiently that Investor Respondents encouraged, incited, aided, or abetted the act of the direct perpetrators of the alleged tort, concluding instead that the actions of Investor Respondents were merely those "normally attendant to a private entity pursuing the private acquisition of a public corporation."

We granted the shareholders' petition for writ of certiorari, 407 Md. 275, 964 A.2d 675 (2009), to consider the following questions, which we have rephrased for clarity:

---

**10.** The court declined to consider whether the Second Amended Complaint stated adequately a claim for breach of fiduciary duty because it found that Petitioners had no legally sufficient cause of action.

I. Did the Court of Special Appeals err in upholding the Circuit Court's dismissal of Petitioners' Second Amended Complaint with prejudice on the grounds that § 2–405.1 bars Petitioners' direct claims against Board Respondents for breaches of fiduciary duties and that Board Respondents did not owe fiduciary duties directly to Petitioners?

II. Did the Court of Special Appeals err in holding that Investor Respondents did not owe and/or could not engage in acts in furtherance of Board Respondents' breaches of fiduciary duties to Petitioners, and therefore, could not conspire with parties who were capable of committing the underlying tort (*i.e.,* the breaches of fiduciary duties)?

III. Did the Court of Special Appeals err in holding that the Amended Complaint did not contain allegations that Investor Respondents encouraged, incited, aided or abetted Board Respondents' breaches of fiduciary duties owed to Petitioners sufficient to reverse dismissal of the aiding and abetting claims in the Amended Complaint? [11]

## II. STANDARD OF REVIEW

We review the grant of a motion to dismiss as a question of law. *Reichs Ford Rd. Joint Venture v. State Rds.*

---

**11.** The Statement of the Question Presented, taken from Petitioners' Brief, reads as follows:

I. Did the Court of Special Appeals ("COSA") err in affirming the Circuit Court's dismissal of the Second Amended Complaint, with prejudice?

II. Did the COSA err in holding that Md.Code Ann. Corps. & Ass'ns § 2–405.1 ("Section 2–405.1") bars shareholders' direct claims against directors for breaches of fiduciary duties and that directors do not owe fiduciary duties to shareholders?

III. Did the COSA err in holding that the Investor Group did not owe and/or could not engage in acts in furtherance of the Directors' breaches of fiduciary duties to Laureate shareholders, and therefore, could not conspire with parties who were capable of committing the underlying tort (*i.e.* the breaches of fiduciary duties)?

IV. Did the COSA err in holding that the Amended Complaint did not contain allegations that the Investor Group encouraged, incited, aided or abetted the Directors' breaches of fiduciary duties owed to shareholders sufficient to reverse dismissal of the aiding and abetting claims in the Amended Complaint?

*Comm'n of the State Hwy. Admin.*, 388 Md. 500, 509, 880 A.2d 307, 312 (2005). In considering a dismissal, we inquire whether the well-pleaded allegations of fact contained in the complaint, taken as true, reveal any set of facts that would support the claim made. *Pittway Corp. v. Collins*, 409 Md. 218, 238–39, 973 A.2d 771, 783 (2009); *Flaherty v. Weinberg*, 303 Md. 116, 135–36, 492 A.2d 618, 628 (1985). A court must assume the truth of all well-pleaded relevant and material facts as well as all inferences that reasonably may be drawn therefrom, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action. *Pittway*, 409 Md. at 239, 973 A.2d at 783; *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 121, 916 A.2d 257, 264 (2007); *Reichs Ford*, 388 Md. at 509, 880 A.2d at 312; *Alleco, Inc. v. The Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 193, 665 A.2d 1038, 1046 (1995); *Lizzi v. Washington Metro. Area Transit Auth.*, 156 Md.App. 1, 7, 845 A.2d 60, 64 (2003). Any ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader. *Alleco*, 340 Md. at 193, 665 A.2d at 1046. Mere conclusory charges that are not factual allegations need not be considered. *Lloyd*, 397 Md. at 121, 916 A.2d at 264–65. This Court views all well-pleaded facts and the inferences from those facts in a light most favorable to the plaintiff, the non-moving party. *Pittway*, 409 Md. at 239, 973 A.2d at 783; *Lloyd*, 397 Md. at 122, 916 A.2d at 265; *Reichs Ford*, 388 Md. at 509, 880 A.2d at 312.

### III. DIRECT AND DERIVATIVE SUITS AGAINST DIRECTORS

The Court of Special Appeals held that § 2–405.1(a) provides the sole source of duties owed by corporate directors and that § 2–405.1(g) bars all direct shareholder claims against those corporate directors for breach of their fiduciary duties.[12] We find both of these conclusions to be erroneous,

---

12. Neither the Circuit Court nor the Court of Special Appeals reached the question of whether Petitioners' plead adequately a claim for breach

and hold that, in the context of a cash-out merger transaction, where the decision to sell the corporation already has been made, corporate directors owe their shareholders common law duties of candor and good faith efforts to maximize shareholder value, and that allegations of breach of those duties may be pursued through a direct suit by shareholders.

## A. The Sources of Corporate Directors' Duties

Section 2–401(a) states that "[t]he business and affairs of a corporation shall be managed under the direction of a board of directors." § 2–401(a). In undertaking those managerial decisions, directors and officers owe the duty of care contained in § 2–405.1(a)[13] to the corporation and its shareholders. *Mona v. Mona Elec. Group, Inc.,* 176 Md.App. 672, 695–96, 934 A.2d 450, 463 (2007). To fulfill this duty of care, directors must perform their managerial acts in good faith, in a manner they believe reasonably to be in the best interest of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. § 2–405.1(a).

---

of fiduciary duty because both courts found that § 2–405.1 required dismissal of Petitioners' claim. Despite Board Respondents' suggestion that we should affirm the lower court's decision on this basis, we decline to consider the issue and leave it to be determined on remand whether Petitioners' complaint states sufficiently a claim for breach of fiduciary duty.

**13.** Section 2–405.1(a) was enacted by the General Assembly in 1976, as part of a comprehensive review of corporation law in Maryland, for the purpose of "establishing an express standard of care for directors in the performance of their duties." 1976 Md. Laws 1479. The new statute tracks closely what is now § 8.30 of the Model Business Corporation Act, which, like § 2–405.1(a), defines the standard of care owed by directors, but does not purport to define globally the specific duties owed by directors to the corporation and to the shareholders. Model Business Corporations Act § 8.30 (3d ed.) (1984, 2005 Supp.). The former Maryland statute closest in relevance appears to have been § 62 of Article 23 of the 1957 Maryland Code, which stated that "[i]n addition to any other liabilities imposed by law upon directors of a corporation," directors could be held liable to the corporation for declarations of dividends, purchases of the corporations own shares, distributions of assets to shareholders, and loans made to officers or directors, if the actions were made "knowingly and without making reasonable inquiry." Md. Ann.Code art. 23, § 62 (1957, 1973 Repl.Vol.).

█ The Court of Special Appeals here found that § 2–405.1(a) is the sole source of directorial duties. Petitioners seek to refute this conclusion and argue that the only duties referred to in § 2–405.1(a) are those that involve the management of the business and affairs of the corporation, matters in which the corporation has an interest, such as the decision whether a corporation should be sold. Those duties, they concede, must be performed in the best interests of the corporation and are enforceable only by the corporation. Beyond and pre-existing § 2–405.1(a), however, lie additional common law duties (referred to by Petitioners as "Shareholder duties") that are triggered once a threshold decision to sell the corporation has been made and which concern only matters personal to the shareholders. Those duties allegedly arise from the Board's undertaking to negotiate the price that shareholders will receive for their shares in a cash-out acquisition of ownership of the corporation, and include fiduciary duties of candor and maximization of the consideration offered for the shares. On this point, we agree with Petitioners and hold that directors of Maryland corporations owe fiduciary duties of candor and maximization of shareholder value to their shareholders beyond those enumerated in § 2–405.1(a), at least in the context of negotiating the amount shareholders will receive in a cash-out merger transaction.

█ It long has been established, by cases decided both prior to and subsequent to the Legislature's enactment of the duty of care for corporate directors contained in § 2–405.1(a), that directors of Maryland corporations stand in a fiduciary relationship to the corporations that they manage and the shareholders of those corporations, a relationship that imposes on directors duties of care, loyalty, and good faith. *Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co.,* 16 Md. 456, 507 (1860); *Booth v. Robinson,* 55 Md. 419, 436–37 (1881); *Storetrax.com, Inc. v. Gurland,* 397 Md. 37, 53, 915 A.2d 991, 1000 (2007); *Mona,* 176 Md.App. at 695, 934 A.2d at 463. We have noted that the "confidence reposed in them, and the position they occupy towards the corporation and its stockholders, require a strict and faithful discharge of duty, and

they are not allowed to derive from their position, either directly or indirectly, any profit or advantage whatever, except it be with the full knowledge and concurrence of the company, represented by others than themselves." *Booth,* 55 Md. at 437; *Coffman v. Maryland Publ'g Co.,* 167 Md. 275, 289, 173 A. 248, 254 (1934) (noting that officers and directors "stand in a fiduciary relationship both to the corporation and to the stockholders, and may not under any circumstances use the power intrusted to them to promote their personal interests at the expense of the stockholders"). We have found also that "[i]t is clear that officers and directors of a corporation stand in a sufficiently confidential relation to the corporation's stockholders to impose a duty upon them to reveal all facts material to the corporate transactions." *Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 74, 242 A.2d 512, 539 (1968). These fiduciary duties are not intermittent or occasional, but instead are the "constant compass by which all director actions for the corporation and interactions with its shareholders must be guided." *Storetrax,* 397 Md. at 54, 915 A.2d at 1001 (quoting *Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998)).[14]

 It is without question that § 2–405.1(a) governs the duty of care owed by directors when they undertake managerial decisions on behalf of the corporation. When directors undertake to negotiate a price that shareholders will receive in the context of a cash-out merger transaction, however, they assume a different role than solely "managing the business and affairs of the corporation." Duties concerning the management of the corporation's affairs change after the decision is made to sell the corporation. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del.1986) (noting that, once sale became inevitable, "[t]he directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders

---

**14.** This Court has noted the "respect properly accorded Delaware decisions on corporate law" ordinarily in our jurisprudence. *See Werbowsky v. Collomb,* 362 Md. 581, 618, 766 A.2d 123, 143 (2001).

at a sale of the company"). Beyond that point, in negotiating a share price that shareholders will receive in a cash-out merger, directors act as fiduciaries on behalf of the shareholders. *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 48–49 (Del.1994) (noting that once directors decide to sell control of a corporation, they have an obligation to search for the best value reasonably available to the stockholders). As a result of the confidence and trust reposed in them during the price negotiation, their ability to affect significantly the financial interests of the shareholders, and the inherent conflict of interest that arises between directors and shareholders in any change-of-control situation, the common law imposes on those directors duties to maximize shareholder value and make full disclosure of all material facts concerning the merger to the shareholders. *See Bennett v. Propp*, 187 A.2d 405, 409 (Del.1962).

■■■■■ Based on the well-established principle that statutes are not presumed to make alterations in the common law other than as may be declared expressly, we disagree with the Court of Special Appeals's and Board Respondents' contentions that § 2–405.1(a) supersedes or supplants all recognized common law duties that pre-existed the adoption of the statute in 1976. *See Walzer v. Osborne*, 395 Md. 563, 573–74, 911 A.2d 427, 433 (2006); *Davis v. Slater*, 383 Md. 599, 615–16, 861 A.2d 78, 87 (2004); *Romm v. Flax*, 340 Md. 690, 698, 668 A.2d 1, 4–5 (1995). We read § 2–405.1(a) as codifying the duty of care owed by directors when acting in their managerial capacities, rather than as a replacement of all previously recognized common law fiduciary duties of directors owed to the corporation and its shareholders. As such, we hold that § 2–405.1(a) does not provide the sole source of directorial duties, and that other, common law fiduciary duties of directors remain in place and may be triggered by the occurrence of appropriate events.

This view is shared in an opinion authored by the Maryland Attorney General in 1997. *See* 62 Op. Atty Gen. Md. 804 (Md.1977). There, the Attorney General contended that the

statutory standard of care contained in § 2–405.1(a) imposes "separate and distinct obligations upon corporate officers and directors" from other common law duties, such as the duty to refrain from usurping a corporate opportunity. *Id.* at 812. In that opinion, cited favorably by the Court of Special Appeals in cases prior to the present litigation, *see Indep. Distribs., Inc. v. Katz*, 99 Md.App. 441, 461, 637 A.2d 886, 895 (1994), the Attorney General opined that when the Legislature enacted § 2–405.1(a), "it did not intend to abrogate the fiduciary duty imposed upon a director or officer not to usurp a corporate opportunity." 62 Op. Atty Gen. Md. at 13–14. Although we deal here with directorial duties other than refraining from usurping corporate opportunity, the Attorney General's opinion suggests that, in enacting § 2–405.1(a), the General Assembly did not seek to occupy the entire field of directorial duties owed by corporate directors, but instead intended to codify the duty of care owed by directors in exercising their managerial duties.

Our conclusion also is consistent with the Delaware Supreme Court's holding in *Revlon.* In that case, the Delaware Supreme Court held that, where it is clear that the board has determined that the corporation is for sale or sale is a foregone conclusion, the duty of the directors "changed from the preservation of [the corporation] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit." *Revlon,* 506 A.2d at 182. The court noted that, at this point, the "directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.*

Board Respondents contend that § 2–405.1(f), an amendment to the statute added in 1999 stating that "[a]n act of a director relating to or affecting an acquisition or a potential acquisition of control of a corporation may not be subject to a higher duty or greater scrutiny than is applied to any other act of a director," demonstrates the Maryland Legislature's intent to reject the reasoning of *Revlon* and the line of Delaware cases that follow it. As will be discussed *infra,* it is

clear to us that the 1999 amendments to § 2–405.1 merely enhanced the protections and defense mechanisms that directors may employ against hostile takeover attempts. *Revlon* and the duties that it described are aimed at the duties involved in a situation where sale of the corporation is a foregone conclusion and the primary remaining interests are those of the shareholders in maximizing their share value in a sale. For that reason, coupled with the presumption regarding the effect of statutory enactments on the common law discussed *infra*, we conclude that § 2–405.1 does not supersede the common law duties long recognized in Maryland, including those characterized in *Revlon*, that, when faced with an inevitable or highly likely change-of-control situation, corporate directors owe their shareholders fiduciary duties of candor and maximization of shareholder value.

Thus, we hold that the Court of Special Appeals erred in concluding that § 2–405.1(a) is the sole source of directorial duties for Maryland corporations and that that subsection supersedes and subsumes all pre-existing common law duties owed by corporate directors to their shareholders. Once the threshold decision to sell Laureate was made, Board Respondents owed fiduciary duties of candor and maximization of shareholder value to Petitioners, common law duties not encompassed or superseded by § 2–405.1(a).

## B. Derivative and Direct Suits

 The Court of Special Appeals held that Petitioners could not pursue their claims for breach of fiduciary duty directly because § 2–405.1(g), also added in 1999, bars all shareholder direct claims and they had "presented no evidence that their grievances are personal to them rather than common to all of Laureate's shareholders." Thus any such claim for breach of fiduciary duties had to proceed derivatively, if at all. Petitioners argue that the "only parties with any interest in—and therefore, with any claim regarding—how much Laureate's public shareholders would personally receive for their shares are the shareholders themselves," and that the "only means available for [Petitioners] to protect themselves from

loss of their property for inadequate consideration as a direct result of the breaches of fiduciary duties by [Board Respondents] is through a direct action." They claim that, when it comes to the consideration that shareholders receive for their stock in a cash-out merger transaction, the corporation has no interest and, thus, no enforceable right to be asserted derivatively. In riposte, Board Respondents contend that a direct claim by a shareholder for breach of duty cannot proceed unless there was an independent and personal relationship between the shareholder and the director. We agree with Petitioners and hold that, in a cash-out merger transaction where the decision to sell the corporation already has been made, shareholders may pursue direct claims against directors for breach of their fiduciary duties of candor and maximization of shareholder value.

 The business and affairs of a corporation, including the decision to institute litigation, are managed generally under the direction of its board of directors. *Bender v. Schwartz,* 172 Md.App. 648, 665, 917 A.2d 142, 152 (2007). Ordinarily, a shareholder does not have standing to sue to redress an injury to the corporation resulting from directorial mismanagement. *Mona,* 176 Md.App. at 697–98, 934 A.2d at 464. Developed as a check on directorial power, the derivative form of action permits an individual shareholder or group of shareholders to bring suit to enforce a corporate cause of action against officers, directors, and third parties where those in control of the company refuse to assert a claim belonging to it. *Bender,* 172 Md.App. at 665, 917 A.2d at 152; *Mona,* 176 Md.App. at 698, 934 A.2d at 464. The purpose of the derivative action is to "place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Danielewicz v. Arnold,* 137 Md.App. 601, 626, 769 A.2d 274, 289 (2001) (quoting *Cohen v. Beneficial Indus Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949)).

In *Waller v. Waller*, we outlined in detail the general concept of the derivative suit and the reasons for allowing such claims:

> It is a general rule that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder though the injury may incidentally result in diminishing or destroying the value of the stock. The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation. The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.

*Waller v. Waller*, 187 Md. 185, 189–90, 49 A.2d 449, 452 (1946). We continued to say that:

> Generally, therefore, a stockholder cannot maintain an action at law against an officer or director of the corporation to recover damages for fraud, embezzlement, or other breach of trust which depreciated the capital stock or rendered it valueless. Where directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation, and the equities of the creditors and stockholders are sought and obtained through the medium of the corporate entity.

*Id.* at 190, 49 A.2d at 452.

 In order to sue derivatively on behalf of the corporation, a plaintiff shareholder must overcome a number of procedural hurdles and demonstrate that he or she, rather

than the corporation itself, should control the litigation. Specifically, before instituting suit, the derivative plaintiff either must make a demand on the corporation's board of directors to pursue the claim against the offending parties or demonstrate to the court that such demand would be futile due to the conflicting interests of the members of the board. *Bender,* 172 Md.App. at 666, 917 A.2d at 152; *Mona,* 176 Md.App. at 699, 934 A.2d at 465–66. Once demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation. *Bender,* 172 Md.App. at 666, 917 A.2d at 152; *Mona,* 176 Md.App. at 700, 934 A.2d at 466. If the corporation, after investigation, fails to take the action requested by the shareholder, the shareholder may bring a "demand refused" action. *Bender,* 172 Md.App. at 666, 917 A.2d at 152; *Mona,* 176 Md.App. at 700, 934 A.2d at 466. In a derivative action, any recovery belongs to the corporation, not the plaintiff shareholder. *Id.* at 698, 934 A.2d at 465.

It is "well established that courts generally will not interfere with the internal management of a corporation." *Devereux v. Berger,* 264 Md. 20, 31, 284 A.2d 605, 612 (1971) (quoting *Parish,* 250 Md. at 74, 242 A.2d at 540). In a derivative action, the business judgment rule protects a disinterested director from liability to the corporation and its stockholders by insulating the business decisions made by the director from judicial review, absent a showing of fraud, self-dealing, unconscionable conduct, or bad faith. *NAACP v. Golding,* 342 Md. 663, 673, 679 A.2d 554, 559 (1996). The "conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are not ordinarily liable." *Devereux,* 264 Md. at 31–32, 284 A.2d at 612 (quoting *Parish,* 250 Md. at 74, 242 A.2d at 540). We have held that the business judgment rule applies to all decisions regarding the corporation's management. *NAACP,* 342 Md. at 673, 679 A.2d at 559.

In contrast to a derivative action, a shareholder may bring a direct action, either individually or as a representative of a class, against alleged corporate wrongdoers when the shareholder suffers the harm directly or a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation. *Matthews v. Headley Chocolate Co.,* 130 Md. 523, 536, 100 A. 645, 650 (1917) (noting that shareholders may sue directly where "they have suffered some peculiar injury independent of what the company has suffered"); *Waller v. Waller,* 187 Md. at 192, 49 A.2d at 453; *Bender,* 172 Md.App. at 665–66, 917 A.2d at 152; *Danielewicz,* 137 Md.App. at 618, 769 A.2d at 284. Cases where direct harm is suffered by shareholders include, for example, actions to enforce a shareholder's right to vote or right to inspect corporate records. That the plaintiff suffered his or her injury in common with all other shareholders is not determinative of whether the injury suffered is direct or indirect. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del.2004) (noting that the issue of whether a claim should be brought derivatively or directly turns on considerations of who suffered the alleged harm and who would receive the benefit of any recovery); *Strougo v. Bassini,* 282 F.3d 162, 171 (2d Cir.2002) (applying Maryland law) (noting that, in Maryland, where shareholders suffer an injury distinct from that of the corporation, rather than deriving from an injury to the business or property of the corporation, "the corporation lacks standing to sue, and Maryland's 'distinct injury' rule allows shareholders access to the courts to seek compensation directly"). Where the rights attendant to stock ownership are adversely affected, shareholders generally are entitled to sue directly, and any monetary relief granted goes to the shareholder. *Mona,* 176 Md.App. at 697, 934 A.2d at 464; *see also* 13 William Meade Fletcher, Cyclopedia of the Law of Private Corporations § 5939 (2004 Rev. Vol.). If the plaintiff demonstrates that he or she has suffered the alleged injury directly, he or she need not make demand on the corporate board of directors or prove futility of demand, and the business judgment rule does not apply.

"A stockholder may proceed with a direct suit or a derivative suit against officers and directors depending on whether the complaining stockholder suffered direct harm or indirect harm as a result of decisions made by the officers or directors of a corporation." Wm. David Chalk, Maryland Corporate Practice and Forms: The DLA Piper Manual § 4.18 (2008); *Mona*, 176 Md.App. at 697, 934 A.2d at 464 (noting that a shareholder may bring a direct action against the corporation, its officers, directors, and other shareholders to enforce a right that is personal to him). "Whether a cause of action is individual or derivative must be determined from the nature of the wrong alleged and the relief, if any, that could result if the plaintiff were to prevail." 12B Fletcher § 5911 (2009 Rev. Vol.). This Court held that, where a shareholder is cheated through misrepresentation and fraud during a sale of stock, no right of action accrues to the corporation because the stock is the personal property of the stockholder. *Llewellyn v. Queen City Dairy, Inc.*, 187 Md. 49, 61, 48 A.2d 322, 328 (1946). In such a case, the right of action lies with the stockholder. *Id.*

Here, Petitioners claim that Board Respondents violated the fiduciary duties of candor and maximization of value that they owed directly to Laureate's shareholders. As discussed above, where a shareholder's action is based on breach of a duty owed directly to the shareholder, a direct action may be filed against the directors. Thus, because the fiduciary duties of Board Respondents were owed directly to Petitioners as shareholders, Petitioners may proceed directly against Board Respondents.

In addition, it is clear that, here, the injury alleged, namely, a lesser value that shareholders received for their shares in the cash-out merger, is an injury suffered solely by the shareholders and not by Laureate as a corporate entity. Such an injury, if suffered, is a direct one, separate from any injury suffered by the corporation, thus allowing Petitioners to proceed with their direct action against Board Respondents. A higher or lower price received by shareholders for their shares

in the cash-out merger in no way implicated Laureate's interests and causes no harm to the corporation.

Were Petitioners required to bring their action derivatively, any recovery would go to the corporation. Such a result demonstrates the error of labeling Petitioners' action a derivative claim, as Board Respondents retaining control of Laureate, the defendants who allegedly breached their fiduciary duties to the shareholders, would share in any potential recovery. Petitioners alleged a direct claim against Board Respondents and were not required to proceed derivatively in the name of the corporation.

### C. The Scope and Effect of Section 2–405.1(g)

The Court of Special Appeals concluded that § 2–405.1(g), which provides that "[n]othing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation," barred Petitioners' direct claim and that the statute contemplated no forms of action for breach of fiduciary duties enforceable other than derivatively. That court also found that the statute "supersedes the common law with respect to claims by shareholders against directors for breach of their fiduciary duties." Petitioners contend that subsection (g) was intended solely to provide a board of directors with additional protections in defending against an unsolicited takeover where the corporation is not for sale and was not designed to affect or eliminate the duties of corporate directors owed directly to shareholders once the decision is made voluntarily to sell the company. They argue that subsection (g) merely states that, when a duty owed to the corporation under § 2–405.1 is breached, that breach may be enforced only by the corporation or in the right of the corporation. Board Respondents counter that subsection (g) plainly provides that claims for breach of fiduciary duty against directors may be brought only by the corporation or derivatively on its behalf.

The cardinal rule of statutory interpretation is to ascertain and carry out the true intention of the Legislature.

*Reichs Ford,* 388 Md. at 517, 880 A.2d at 316; *W. Corr. Inst. v. Geiger,* 371 Md. 125, 140, 807 A.2d 32, 41 (2002). We look first to the language of the statute itself and its stated intention, according the words of the statute their ordinary and natural significance. *Reichs Ford,* 388 Md. at 517, 880 A.2d at 316; *Geiger,* 371 Md. at 141, 807 A.2d at 41–42. Where the words of a statute are plain and free from ambiguity, and express a definite and simple meaning, courts do not normally look beyond the words to determine legislative intent. *Id.* at 141, 807 A.2d at 42. In conducting statutory interpretation, "[w]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *BAA, PLC v. Acacia Mut. Life Ins. Co.,* 400 Md. 136, 151, 929 A.2d 1, 10 (2007) (quoting *Taylor v. NationsBank, N.A.,* 365 Md. 166, 181, 776 A.2d 645, 654 (2001)). The statute is to be read so that no word, phrase, clause, or sentence is rendered meaningless. *Reichs Ford,* 388 Md. at 517, 880 A.2d at 316. Where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, however, courts consider not only the literal or usual meaning of the words, but also their meaning and effect in light of the setting, the objectives and purpose of the enactment. *Romm,* 340 Md. at 693, 668 A.2d at 2. In construing statutory language, we seek to avoid results which are illogical, unreasonable, or inconsistent with common sense. *Id.*

 According to our reading, the language of subsection (g), which states that "[n]othing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation," plainly means that, to the extent § 2–405.1 creates duties on directors such as the duty of care contained in § 2–405.1(a), those duties are enforceable only by the corporation or through a shareholders' derivative action. The language of the statute makes no mention of barring direct shareholder actions against directors based on duties created other than by § 2–405.1, such as the fiduciary duties of candor and maximization of share-

holder value discussed *infra*. *See* § 2–405.2 ("The charter of the corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation *or its stockholders....*") (emphasis added). Thus, based on the plain language of § 2–405.1(g), we hold that the subsection does not bar direct shareholder actions where such actions are based on duties imposed or authorized otherwise than by § 2–405.1.

For the sake of testing the validity of our construction, we note that evidence from the legislative history of the 1999 amendments explicitly states that the Legislature, in adding subsection (g), sought "to strengthen Maryland's laws relating to unsolicited takeovers of corporations and real estate investment trusts." Bill Analysis of S.B. 169 (1999); Senate Judicial Proceedings Committee Report of Feb. 25, 1999 (noting that the bill "gives Maryland corporations and real estate investment trusts (REITs) additional tools to avoid unwelcome takeovers as they occur today"). The short title of S.B. 169 was "Corporations and Real Estate Investment Trusts–Unsolicited Takeovers." More specifically, the amendments made clear that the standard of care for directors did not require them to accept, recommend, or even respond to unsolicited takeover bids, and that a director's failure to act solely because of the amount of consideration offered to stockholders would not expose that director to liability. Additionally, the amendments state that actions of directors relating to acquisitions, namely, implementing defensive mechanisms used to frustrate or prevent hostile takeovers, are not subject to a higher duty or greater scrutiny than any other acts of directors. The entirety of the legislative history of the 1999 amendments to § 2–405.1 suggest that subsections (f) and (g) were enacted to address problems presented in hostile takeovers of Maryland corporations. Subsections (f) and (g) were not intended to remove the ability of shareholders to bring direct claims for breach of fiduciary duty in situations where there is an imminent voluntary change of corporate control or ownership, rather than a hostile takeover. To the contrary, the legislative history states that (f) and (g) were meant to

reject in Maryland the "heightened scrutiny" imposed on directors of Delaware corporations in hostile takeover situations by the Delaware Supreme Court in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985), a relatively rare rejection in Maryland of Delaware's acknowledged leadership in developing a coherent body of corporate law to which we and many other states ordinarily look for guidance.[15]

Board Respondents contend anticipatorily that this reading of § 2-405.1 is at odds with the provisions of § 2-405.1(c) and § 5-417 of the Courts and Judicial Proceedings Article, the latter of which states that "[a] person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation." Md.Code Ann., Cts. & Jud. Proc. § 5-417 (1974, 2006 Repl.Vol.). As noted earlier, however, the standard of care provided by § 2-405.1(a), which otherwise would immunize directorial actions from judicial scrutiny, is inapplicable to decisions made outside the purely managerial context, such as negotiating the price shareholders will receive in a cash-out merger transaction. Thus, while § 2-405.1(c) and § 5-417 of the Courts and Judicial Proceedings Article provide for liabili-

---

**15.** In *Unocal*, a case addressing the level of scrutiny to be applied to defense mechanisms used by directors to resist hostile takeovers, the Delaware Supreme Court stated that:

When a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders. In that respect a board's duty is no different from any other responsibility it shoulders, and its decisions should be no less entitled to the respect they otherwise would be accorded in the realm of business judgment. There are, however, certain caveats to a proper exercise of this function. Because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders, there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred.

*Unocal*, 493 A.2d at 954 (internal citation omitted). The legislative history of the 1999 amendments to § 2-405.1 make it abundantly clear that the Maryland Legislature considered, but decided not to impose, such a heightened standard in hostile takeover situations.

ty to be limited by the business judgment rule as codified in § 2–405.1(a), those provisions do not immunize directors from liability for breach of their common law duties of candor and maximization of shareholder value once the threshold decision to sell the corporation is made.

We hold, therefore, that the Court of Special Appeals erred in holding that § 2–405.1(g) bars all shareholders' direct suits. In the context of a cash-out merger transaction, where the decision to sell the corporation already has been made by the Board of Directors, those directors owe common law fiduciary duties of candor and maximization of shareholder value directly to the shareholders themselves, and claims for breach of those duties may be brought directly, despite the provisions of § 2–405.1(g). Thus, we hold that Petitioners may proceed in a direct action against Board Respondents based on their claims of breach of fiduciary duties owed directly to them by Board Respondents.

### IV. CIVIL CONSPIRACY

 The Court of Special Appeals upheld the dismissal of Petitioners' claim against Investor Respondents for civil conspiracy on the ground that Investor Respondents did not owe fiduciary duties to Petitioners and were "consequently legally incapable of committing the underlying tort." [16] We agree and hold that a defendant may not be adjudged liable for civil conspiracy unless that defendant was legally capable of committing the underlying tort alleged.

 Civil conspiracy is "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an unlawful act not in itself illegal, with the further requirement

---

**16.** Like the Court of Special Appeals, we assume, without deciding that it is so solely for the purposes of this appeal, that breach of fiduciary duties is a cognizable tort in Maryland. *See Alleco,* 340 Md. at 192, 665 A.2d at 1046 ("[W]e shall assume, solely for purposes of discussion in this case, that Maryland law does recognize the tort of breach of fiduciary duty.").

that the act or means employed must result in damages to the plaintiff." *Hoffman v. Stamper*, 385 Md. 1, 24, 867 A.2d 276, 290 (2005) (quoting *Green v. Wash. Sub. San. Comm'n*, 259 Md. 206, 221, 269 A.2d 815, 824 (1970)). The plaintiff "must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury." *Id.* at 25, 867 A.2d at 290. The tort of civil conspiracy "lies in the act causing the harm; the agreement to commit the act is not actionable on its own but rather is in the nature of an aggravating factor." *Id.; Alleco*, 340 Md. at 189, 665 A.2d at 1044–45 (noting that conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff"). A participant in the conspiracy may be held liable civilly as long as some act was performed in furtherance of the conspiracy, even if performed by another participant. *Id.*

We have not had occasion previously to consider whether a defendant may be held liable as a civil co-conspirator where that defendant is legally incapable of committing the underlying tort. Other courts, however, have held that "tort liability arising from a conspiracy presupposes that the coconspirator is legally capable of committing a tort, that is, that she owes a duty to the plaintiff recognized by law and is potentially subject to liability for breach of that duty." *See Bahari v. Countrywide Home Loans*, 2005 WL 3505604, at *6, 2005 U.S. Dist. LEXIS 34741, at *19–20 (D.Md. Dec. 16, 2005); *BEP, Inc. v. Atkinson*, 174 F.Supp.2d 400, 409 (D.Md.2001) (holding that "[a] cause of action for civil conspiracy may therefore not arise if the alleged conspirator, though allegedly a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing"). The reasoning of these decisions persuades us to hold that, in Maryland, liability for civil conspiracy based on the underlying tort of breach of fiduciary duty (were it recognized) would require proof that the defendant, although not committing personally the underlying tort, was legally capable of committing the underlying tort. Because Investor Respondents owed no fiduciary duty to Petitioners, they may not be held liable

for civil conspiracy in this case. The Circuit Court's dismissal of Petitioners' civil conspiracy claims against Investor Respondents, and the Court of Special Appeals's affirmance of that judgment, are affirmed.

## V. AIDING AND ABETTING

The Court of Special Appeals also held that the Amended Complaint did not allege sufficiently that Investor Respondents encouraged, incited, aided or abetted the act of the direct perpetrators of the alleged tort of breach of fiduciary duty and therefore upheld dismissal of the aiding and abetting count. We affirm that judgment.

We note at the outset that Petitioners, in their brief before this Court, rely heavily on allegations made in their Second Amended Complaint to support their contention that the Circuit Court erred in dismissing the aiding and abetting claim against Investor Respondents. The 11 May 2007 order of dismissal regarding the aiding and abetting claim was based solely on Petitioners' Amended Complaint, and no claim for aiding and abetting against Investor Respondents appears in the Second Amended Complaint. Thus, we determine the sufficiency of the claim for aiding and abetting by examining only the Amended Complaint.[17]

The allegations made by Petitioners fail to demonstrate that the actions taken by Investor Respondents, alleged to have aided and abetted Board Respondents' breach of fiduciary duties, were anything more than "those normally attendant to a private entity pursuing the private acquisition of a public corporation." The crux of Petitioners' allegations seem to pin their claim on the restrictive nature of the merger agreement presented by Investor Respondents to Board Respondents. We fail to see how merely offering an agreement containing penalties if Board Respondents solicited or accept-

---

**17.** Petitioners persist in referring to the paragraphs in the Amended Complaint supporting their aiding and abetting claim as coming from the Second Amended Complaint.

ed competing bids for Laureate rises to the level of encouraging or inciting Board Respondents' alleged breach of their fiduciary duties.

## VI. CONCLUSION

We hold that, in the context of a cash-out corporate merger transaction where the board of directors already has made the decision to sell the corporation, Board Respondents thereafter owed common law fiduciary duties of candor and maximization of shareholder value directly to Petitioners, entitling Petitioners to bring a direct action against those Board Respondents for alleged breach of those fiduciary duties. As such, we reverse in part the judgment of the Court of Special Appeals which affirmed the Circuit Court's dismissal of those claims. We affirm, however, the dismissal of Petitioners' civil conspiracy and aiding and abetting claims on the ground that the Amended Complaint failed to allege sufficiently claims upon which relief could be granted.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE IN PART AND AFFIRM IN PART THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY, CONSISTENT WITH THIS OPINION, AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID 50% BY PETITIONERS AND 50% BY BOARD RESPONDENTS.**