45 A.3d 925

David SCULL, et al.

v.

DOCTORS GROOVER, CHRISTIE & MERRITT, P.C.

No. 332, Sept. Term, 2011.

Court of Special Appeals of Maryland.

June 7, 2012.

568

Steven A. Skalet (Mehri & Skalet, PLLC, on the brief), Washington, DC, for Appellant.

Brian S. Goodman (Alexandra P. Moylan, Hodes, Pessin & Katz PA, on the brief), Towson, MD, for Appellee.

Panel: ZARNOCH, BERGER and RAYMOND G. THIEME, JR., (Retired, Specially Assigned), JJ.

BERGER, J.

This case arises from an Order of the Circuit for Montgomery County granting appellee Doctors Groover Christie & Merritt, P.C.'s ("GCM") motion to dismiss. Appellant David Scull ("Scull") filed a two count amended complaint against GCM. Thereafter, GCM filed a motion to dismiss the amended complaint. The Circuit Court for Montgomery County granted the motion to dismiss and ordered Scull's complaint dismissed with prejudice.

Scull filed a timely appeal and presents four issues for our review, which we have rephrased as follows:

1. Whether the trial court erred in ruling that the Maryland HMO Act precludes a private cause of action against a health care provider.

2. Whether the trial court erred in ruling that GCM, a medical provider, was exempt from the Maryland Consumer Protection Act.

3. Whether the trial court erred in ruling that GCM's billing practices did not constitute an unfair and/or deceptive business practice under the Consumer Protection Act.

4. Whether the trial court erred in ruling that GCM was not unjustly enriched by Scull's payment of a bill after GCM refunded the money to Scull after it discovered the payment was made in error.

For the reasons set forth below, we affirm the judgment of the Circuit Court for Montgomery County.

## FACTS AND PROCEDURAL BACKGROUND

Scull is an enrollee in the United Healthcare Select HMO [1] offered by the Montgomery County Government. In May 2008, Scull was referred to GCM by an orthopedic specialist for x-rays on his knee. That day, an employee of GCM completed the required x-rays.

After the x-ray procedure concluded, Scull believed his interactions with GCM had ceased. Scull understood that his insurance policy with United Healthcare ("UHC") fully covered payment for the x-ray procedure. Approximately one year later, in May 2009, Scull received an invoice from GCM. [2] The invoice reflected that the x-rays taken on Scull's knee cost $242.00. The amount due was reduced to $121.00 because of an "adjustment" and payment received by GCM from Scull's insurance provider. The invoice provided that Scull was to pay the remaining $121.00 because GCM was "unable to collect from [his] insurance because, [his] insurance states [he has] other primary coverage." The invoice also instructed Scull to contact Health Care Management Group ("HCMG"), GCM's billing agent, if he had any questions or concerns about the bill.

After reviewing the invoice, Scull contacted HCMG. An HCMG employee informed Scull that UHC reversed the payment it made to GCM. As a result, HCMG recommended that Scull submit his claim to Medicare. Scull, thereafter, contact-

---

1. HMO is the common abbreviation for health maintenance organization. HMOs are:

 any person, including a profit or nonprofit corporation organized under the laws of any state or country, that ... provides or otherwise makes available to its members health care services that include at least physician, hospitalization, laboratory, X-ray, emergency, and preventive services, out-of-area coverage, and any other health care services that the [Insurance] Commissioner determines to be available generally on an insured or prepaid basis in the area serviced by the health maintenance organization

 ....

 Md.Code (1982, 2009 Repl.Vol.) § 19–701(g) of the Health–General Article ("HG").

2. The invoice is dated May 22, 2009.

ed UHC because he believed the x-rays were fully covered and paid for by UHC. Scull testified that UHC informed him that it "had paid GCM for the covered service." [3] Subsequently, Scull sent an email to HCMG explaining his initial call with HCMG and his call with UHC. An employee of HCMG responded to Scull's email advising him to disregard any invoices and informing Scull that his account was adjusted to reflect a $0.00 balance.

Approximately one week later, Scull received an additional copy of the initial invoice reflecting a balance due of $121.00. Despite being told by HCMG to disregard any statements and that his account had a $0.00 balance, Scull did not contact HCMG to determine whether this invoice was inadvertently sent. Instead, Scull sent GCM a check for the balance because he feared that GCM would report him to credit rating agencies if he did not pay the amount due. Two to three months later, Scull received a check from GCM in the amount of $121.00. This check was accompanied with a letter stating that GCM discovered Scull's overpayment through an audit and was refunding the balance due to Scull.

Believing "GCM adjusted his account and sent him a check because he discovered [GCM]'s practice of balance billing, [ [4]]" Scull elected not to cash the check.[5] Instead, he filed a class

---

3. No evidence was presented or offered to demonstrate that UHC paid for the entire cost of the x-ray procedure. As was reflected on the invoice received by Scull, GCM received payment from Scull's insurance provider for a portion of the x-ray procedure, but that payment did not cover the entire cost.

4. Balance billing is the practice of billing HMO subscribers for medical bills that have been paid for by an HMO. When a provider is paid by an HMO, but the amount is less than what the provider charges for the service, the provider is typically required to contact the HMO to resolve the dispute. Illegal balance billing occurs when a provider, instead, contacts the patient. As will be discussed, *infra*, there are limited occasions where a provider may directly bill a patient for such amounts due under the HMO act. These situations are, therefore, exempt from the illegal character of balance billing.

5. Scull further noted that, as a lawyer, he could more easily take action against GCM.

action complaint in the Circuit Court for Montgomery County. His complaint alleged three claims, namely: a violation of the Maryland HMO Act;[6] a violation of the Maryland Consumer Protection Act;[7] and a claim that GCM was unjustly enriched through its "unlawful balance billing practices."

Soon thereafter, GCM moved to dismiss Scull's complaint. After a hearing, the circuit court granted GCM's motion to dismiss all three counts. The circuit court dismissed Scull's claims without prejudice so that he could amend the complaint, if necessary. Scull, subsequently, amended his initial complaint to add additional facts and remove the claim for a violation of the HMO Act. Thereafter, GCM moved to dismiss the amended complaint. The circuit court held a hearing on GCM's motion to dismiss after which it dismissed Scull's claims with prejudice.

Scull timely filed an appeal of the circuit court's dismissal of all three claims.

## STANDARD OF REVIEW

It is well settled that the "[d]ismissal [of a claim] is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff." *Bobo v. State*, 346 Md. 706, 709, 697 A.2d 1371, 1373 (1997) (citing *Morris v. Osmose Wood Preserving*, 340 Md. 519, 531, 667 A.2d 624, 630 (1995)). An appellate court "review[s] the grant of a motion to dismiss as a question of law." *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 334, 983 A.2d 408, 418 (2009). When we evaluate such a dismissal, "we inquire whether the well-pleaded allegations of fact contained in the complaint, taken as true, reveal any set of facts that

---

**6.** Subtitle 7 of Title 19 of the Health–General Article of the Maryland Code is commonly referred to as the Maryland HMO Act ("HMO Act").

**7.** Title 13 of the Commercial Law Article of the Maryland Code is commonly referred to as the Maryland Consumer Protection Act ("Consumer Protection Act").

would support the claim made." *Id.* at 335, 983 A.2d at 418 (internal citations omitted).

In completing this evaluation, "[a] court must assume the truth of all well-pleaded relevant and material facts as well as all inferences that reasonably may be drawn therefrom, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, i.e., the allegations do not state a cause of action." *Id.* (internal citations omitted). Furthermore, "[a]ny ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader." *Id.* We need not consider "conclusory charges that are not factual allegations." *Id.* Finally, an appellate court must view "all well-pleaded facts and the inferences from those facts in a light most favorable to the plaintiff, the non-moving party." *Id.* (internal citations omitted).

## DISCUSSION

### I.

Scull initially claims that GCM violated HG § 19–710(p)(1) when it sent him a bill for services that he believed were fully covered by his HMO. HG § 19–710(p) provides:

(1) Except as provided in paragraph (3) of this subsection, individual enrollees and subscribers of health maintenance organizations issued certificates of authority to operate in this State shall not be liable to any health care provider for any covered services provided to the enrollee or subscriber.

(2)(i) A health care provider or any representative of a health care provider may not collect or attempt to collect from any subscriber or enrollee any money owed to the health care provider by a health maintenance organization issued a certificate of authority to operate in this State.

(ii) A health care provider or any representative of a health care provider may not maintain any action against any subscriber or enrollee to collect or attempt to collect any money owed to the health care provider by a health

maintenance organization issued a certificate of authority to operate in this State.

(3) Notwithstanding any other provision of this subsection, a health care provider or representative of a health care provider may collect or attempt to collect from a subscriber or enrollee:

(i) Any copayment or coinsurance sums owed by the subscriber or enrollee to a health maintenance organization issued a certificate of authority to operate in this State for covered services provided by the health care provider;

(ii) If Medicare is the primary insurer and a health maintenance organization is the secondary insurer, any amount up to the Medicare approved or limiting amount, as specified under the Social Security Act, that is not owed to the health care provider by Medicare or the health maintenance organization after coordination of benefits has been completed, for Medicare covered services provided to the subscriber or enrollee by the health care provider; or

(iii) Any payment or charges for services that are not covered services.

HG § 19–710(p). Scull maintains that his HMO paid for the x-ray services and, therefore, GCM violated HG § 19–710(p)(1) by sending an invoice for a service covered by his HMO. Scull further contends that there is no explicit method of recovery for violations of HG § 19–710(p). As a result, he argues that an implied private cause of action should be read into the statute.

GCM counters that the HMO Act does not apply to it because it is not an HMO and the HMO Act only applies to certified HMOs. In the alternative, GCM argues, assuming *arguendo*, that the HMO Act applies to it, the HMO Act does not contain an implied private cause of action. Accordingly, GCM contends that Scull should have followed the express grievance procedures contained in the HMO Act which do not

authorize the filing of a private suit against GCM for alleged violations of the HMO Act.

The circuit court rejected GCM's first contention, finding that the HMO Act applies to GCM. The circuit court further found that the HMO Act does not contain a private cause of action. The circuit court, therefore, granted GCM's motion to dismiss the HMO Act claim finding:

> I think that, contrary to the contention that [GCM] raises, that [the HMO Act] doesn't apply to medical providers, I certainly think, based on my review, that I could find it applies to medical providers, as well as to HMO's.
>
> * * *
>
> Having reviewed the *Sugarloaf* case and the cases that are cited in there, the *Widgeon* case, the *IVTX* case, and the other cases that are cited in that as well, I just don't see how—I think I agree with [GCM's] counsel that—and *Sugarloaf* actually cites the United States Supreme Court decision in *Transamerica Mortgage Advisors, Inc. v. Lewis,* where they're saying that it's improbable that—and they're referring in this case to Congress—that Congress would absentmindedly forget to mention an intended private action.
>
> Looking at the legislative history, the purpose of the statute, looking at the identity of the class for whose particular benefit the statute was passed, and the existence of expressed statutory remedies, I'm not inclined to find that there is a private right to pursue an action. So at this point I'm going to dismiss Count 1.

■ The circuit court did not err in finding that the HMO Act applies to providers in addition to HMOs. GCM accurately maintains that, "Subtitle 7 of Title 19 of the Health–General Article is dedicated to the formation of Health Maintenance Organizations." *Riemer v. Columbia Med. Plan, Inc.,* 358 Md. 222, 242, 747 A.2d 677, 688 (2000). Nevertheless, the dedication of the act to the formation and regulation of HMO's does not preclude its application to other groups that have interactions with HMOs. Clearly, the language in HG § 19–

710(p) reflects that the HMO Act applies to providers. Specifically, HG § 19–710(p)(2) describes actions that health care providers (not merely HMOs) are forbidden from taking. *See* HG § 19–710(p)(2). Therefore, it is clear that the General Assembly intended the HMO Act to apply not only to HMOs but, in certain situations, to others involved in HMO practice.

■ We now turn to whether the circuit court erred in finding that no private cause of action, express or implied, exists in the HMO Act. The Court of Appeals has explained that three factors must be evaluated when determining whether an implied private cause of action may be read into a statute. These factors include: 1) "presence or absence of an indication of legislative intent to create a private remedy;" 2) "whether the plaintiff is one of the class for whose special benefit the statute was enacted;" and 3) "whether it is consistent with the underlying purposes of·the legislative scheme to imply such a remedy for the plaintiff." *Erie Ins. Co. v. Chops*, 322 Md. 79, 90–91, 585 A.2d 232, 237 (1991).

■ Of these factors, our "primary focus in resolving such a question is the legislative intent." *Sugarloaf Citizens Assoc., Inc. v. Gudis*, 78 Md.App. 550, 556, 554 A.2d 434, 437 (1989) (internal citations omitted). When examining legislative intent in this context, we must evaluate various factors:

> including the legislative history and purposes of the statute, the identity of the class for whose particular benefit the statute was passed, the existence of express statutory remedies to serve the legislative purpose, and the traditional role of the states in affording the relief claimed.

*Id.* at 557, 554 A.2d at 437. The legislative history of the HMO Act is silent concerning any intent to create a private cause of action. Typically, legislative silence weighs against reading an implied cause of action into a statute. *IVTX, Inc. v. United Healthcare of the Mid–Atlantic, Inc.*, 112 F.Supp.2d 445, 447 (D.Md.2000) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)). This, however, typically only applies on the federal level.

As we noted in *Sugarloaf, supra,* "[g]iven the vast differences in legislative record-keeping between Congress and a municipal or local government, we hesitate to place such great weight on the fact that the legislative history available to us is silent as to ... creat[ing] an implied private right of action." *Sugarloaf, supra,* 78 Md.App. at 558, 554 A.2d at 438. While in *Sugarloaf* we analyzed a county ordinance, not a state statute, the same analysis applies here. *See IVTX, supra,* 112 F.Supp.2d at 447 ("Given a similar comparative sparsity of legislative history accompanying Maryland state legislation [and municipal rule making], the Court agrees that this first factor is entitled to little weight").

We, therefore, must analyze the other factors in greater detail to determine whether the General Assembly intended a private right of action to exist under the HMO Act. HG § 19–702 specifically describes the General Assembly's intent and policy when it enacted the HMO Act:

(a) Statement of intent.—In adopting this subtitle, the General Assembly intends to:

(1) Provide alternative methods for the delivery of health care services **to residents of this State, with a view toward achieving greater efficiency and economy in providing these services;**

(2) Encourage the formation of health maintenance organizations that provide health care services to subscribers or groups of subscribers who contract for these services under a system of prepayments; and

(3) Encourage the formation of health maintenance organizations by ... diverse groups....

\* \* \*

(b) Policy.—To carry out the intent of subsection (a) of this section, the policy of this State is to:

(1) Provide one overall State law that:

(i) Regulates health maintenance organizations;

(ii) Allows flexibility for the many forms these health maintenance organizations may take; and

(iii) Facilitates public understanding and uniform administration of the rules and regulations that are adopted under this subtitle. . . .

HG § 19–702 (emphasis added). Moreover, the Court of Appeals has stated that the intent of the HMO Act is to "keep the health care system in Maryland efficient and affordable. . . ." *Riemer, supra*, 358 Md. at 247, 747 A.2d at 691. It, therefore, is clear that the General Assembly intended the HMO Act to benefit the public as whole by providing an alternative and affordable method to pay for healthcare.

▇ In analyzing situations such as the one presented in the instant case, the "Court of Appeals has distinguished between those statutes designed to confer a general benefit on the public at large and those designed to protect a particular subgroup of the public or to preserve or create individual rights." *IVTX, supra*, 112 F.Supp.2d at 447 (citing *Widgeon v. Eastern Shore Hosp. Ctr.*, 300 Md. 520, 536, 479 A.2d 921, 929 (1984)). A private cause of action is much more likely to be implied in a statute that is designed to protect a particular subgroup of the public or create individual rights than a statute intended to assist the public as a whole. The HMO Act was drafted to provide a service to the public as a whole, not any singular subgroup. Accordingly, we hold that the General Assembly did not intend to create an implied private cause of action under the HMO Act.

▇ Moreover, "where the plain language of a provision weighs against implication of a private remedy, silence within the legislative history as to a private cause of action reinforces the decision not to find such a right implicitly." *IVTX, supra*, 112 F.Supp.2d at 447. The text of the HMO Act weighs against creation of an implied private cause of action because it provides an express statutory remedy for violations of the Act. The HMO Act creates a grievance system whereby HMOs and members of HMOs may file grievances with the Insurance Commissioner to address issues concerning violations of the HMO Act.

It is well settled that "an elemental canon of statutory construction [is] where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Sugarloaf, supra,* 78 Md.App. at 559, 554 A.2d at 438 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)). In drafting the HMO Act, the General Assembly expressly charged the Insurance Commissioner with enforcing the terms of the statute. *See* HG § 19–729; 19–730; 19–732. Because the HMO act provides an express remedy, we must be careful when asked to find an additional implied remedy.

Scull argues that while the statute provides the Insurance Commissioner with enforcement power, this power is of no use to him. Scull maintains that the HMO Act only provides the Insurance Commissioner with the ability to sanction HMOs, not providers. Therefore, because Scull's grievance is with GCM, a provider, not an HMO, the powers provided to the Insurance Commissioner are of no use. That contention, however, is misplaced. The actions which the Insurance Commissioner is permitted to take for violations of the HMO act are set forth in HG § 19–730. HG § 19–730 provides that "[i]f any person violates any provision of ... this subtitle, the Commissioner may...." [8] The statute further provides an extensive list of actions that the Insurance Commissioner may take for various violations of the HMO Act. The vast majority of these actions, as Scull points out, relate solely to HMOs, including the ability to take certain actions such as suspension or revocation of the HMO's certificate of authority to do business as an HMO.

■ There is, however, a provision in the statute that authorizes the Insurance Commissioner to take action against not only HMOs but any other person who violates the HMO

---

**8.** HG § 1–101 defines "person" as "an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, association, corporation, or other entity." Clearly, GCM is included in this definition of "person."

Act. HG § 19–730(a)(5) provides that the Insurance Commissioner may:

> Apply to any court for legal or equitable relief considered appropriate by the Commissioner or the Department, in accordance with the joint internal procedures.

Therefore, while the vast majority of actions permitted to be taken by the Insurance Commissioner are only effective against HMOs, the Insurance Commissioner has the authority to bring suit against any person in the appropriate court. As we stated in *Sugarloaf,* "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." 78 Md.App. at 559, 554 A.2d at 438. Because the General Assembly clearly explained how claims under the HMO Act should be initiated, that is, by and through the Insurance Commissioner (and this method for claims provides a vehicle to address Scull's claims against GCM), we do not read an implied cause of action into the HMO Act. Accordingly, all factors established by the Court of Appeals in *Erie Ins. Co., supra,* weigh against reading an implied cause of action into the HMO Act. Therefore, the circuit court was legally correct in determining that no private cause of action exists in the HMO Act.

■ Assuming, *arguendo,* that an implied private cause of action exists under the HMO Act, GCM's billing of Scull would not constitute balance billing as prohibited by HG § 19–710(p). When Scull discussed his concerns with HCMG about the bill, HCMG advised Scull that he should submit his claim to Medicare for payment because it believed that Scull's medical expenses were covered by Medicare. Accordingly, the invoice that GCM sent Scull fits squarely within the exception from balance billing contained in HG § 19–710(p)(3)(ii). HG § 19–710(p)(3)(ii) provides:

> (3) Notwithstanding any other provision of this subsection, a health care provider or representative of a health care provider **may collect or attempt to collect from a subscriber or enrollee:**

(ii) **If Medicare is the primary insurer and a health maintenance organization is the secondary insurer,** any amount up to the Medicare approved or limiting amount, as specified under the Social Security Act, that is not owed to the health care provider by Medicare or the health maintenance organization after coordination of benefits has been completed, for Medicare covered services provided to the subscriber or enrollee by the health care provider; . . .

HG § 19–710(p)(3)(ii) (emphasis added). Accordingly, GCM did not violate the HMO Act when it sent Scull an invoice for services that it believed was covered by Medicare.

## II.

 Scull further maintains that GCM violated the Consumer Protection Act when it sent him a bill he believed was paid by his HMO. Scull argues that billing is not included in the exemption in the Consumer Protection Act for the professional services of a medical practitioner. This contention is based on a belief that billing does not require the specialized education and expertise necessary for professional medical services. Scull, therefore, argues that billing is not included in this exemption.

Additionally, Scull contends that GCM billed for services that were paid for by his HMO. Further, HCMG represented to Scull that his account had a $0.00 balance. Scull, therefore, claims that GCM engaged in an unfair and deceptive practice that is actionable under the Consumer Protection Act. GCM responds that there is no Maryland law excluding billing services from the professional services that are exempt from the Consumer Protection Act. Further, GCM argues that even if not exempted from the Consumer Protection Act, its billing Scull was not an unfair or deceptive practice cognizable under the Consumer Protection Act. The circuit court agreed with GCM and dismissed Scull's Consumer Protection Act claim finding:

Having read the Maryland Consumer Protection Act, I think it's very clear that it does not pertain to medical providers. And even assuming that it did, I just don't see how the way that the complaint is framed and the way that the statute is framed that in any way there could be—that that invoice and the oral representations made by the billing agent, that any of that could fall under the Consumer Protection Act. So I am going to grant the motion to dismiss in regard to Count 2.

The Consumer Protection Act specifically exempts "professional services of a ... medical or dental practitioner" from its application. Md.Code (1975, 2005 Repl.Vol.), § 13–104(1) of the Commercial Law Article (hereinafter "CL"). Scull, however, contends that this exemption only applies to direct professional services, not services indirectly related to the provision of professional services, such as billing. This contention is based on a reading of a myriad of cases from different jurisdictions. It is noteworthy that no case in a Maryland state or federal court has arrived at this conclusion.

Indeed, in *Robinson v. Fountainhead Title Group Corp.*, 447 F.Supp.2d 478 (D.Md.2006), the plaintiff alleged that she sued Long & Foster Realty not "because of its activities as a realtor, but because it worked in conjunction with the other defendants to establish the sham company." *Id.* at 490. In dismissing the claim based on the Consumer Protection Act, the Court found "Plaintiff's allegations, nonetheless, concern the 'professional services' of Defendants...." *Id.* We find *Robinson* persuasive because it addressed whether services outside of direct professional conduct are included in professional services under the same Consumer Protection Act statute. The circuit court, therefore, was legally correct in finding that the billing services of GCM are included in professional services and are, therefore, exempt from the Consumer Protection Act.

Because we determine that the Consumer Protection Act does not apply to GCM, we need not address whether GCM's billing constitutes an unfair or deceptive practice actionable

under the Consumer Protection Act. Accordingly, the circuit court was legally correct in dismissing Scull's Consumer Protection Act claim.

### III.

Scull's final claim is that GCM was unjustly enriched by payment of improper bills sent to Scull and "potentially thousands of Maryland HMO subscribers." Scull maintains that it was reasonable for him to send the payment of $121.00 to GCM after he spoke with GCM's billing agent and was told to disregard any bills because his account had a $0.00 balance. Scull further contends that GCM was unjustly enriched because he paid the bill and GCM took a few weeks to return the funds. GCM counters that upon discovering Scull's payment of $121.00 when his account had a $0.00 balance, it immediately sent Scull a check for reimbursement of the $121.00. Despite GCM attempting to return the funds, Scull elected not to cash the check. The circuit court dismissed the unjust enrichment claim finding that:

> I don't think that I can really find that—I think that, based on the way that the complaint outlines the facts, I don't think that there is unjust enrichment here. I think, clearly they refunded his money.

It is well settled that, "[u]njust enrichment is a claim ... that may not be reduced neatly to a golden rule." *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 295, 936 A.2d 343, 351 (2007). As such, it is a claim in equity for return of a benefit which was given to a party that did not earn such a benefit. *See id.* at 295–96, 936 A.2d at 351–52. In order to establish a claim for unjust enrichment one must prove that:

> (1) the plaintiff confer[red] a benefit upon the defendant; (2) the defendant [knew] or appreciate[d] the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances [wa]s such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return.

*Benson v. State,* 389 Md. 615, 651–52, 887 A.2d 525, 546 (2005) (quoting *Caroline County v. Dashiell,* 358 Md. 83, 95 n. 7, 747 A.2d 600, 607 n. 7 (2000)).

Scull clearly meets the first prong of the test. He sent GCM a check for $121.00, thereby conferring the benefit of an additional $121.00 on GCM. The circuit court, however, correctly ruled that the second and third elements of unjust enrichment were not established. No evidence was presented that GCM appreciated the benefit of the $121.00. In fact, evidence was presented to the contrary. Upon realizing that Scull mistakenly paid the $121.00 to GCM, GCM refunded the payment to Scull.

Scull, however, argues that, to this day, he has not received the benefit of his $121.00. Scull's argument is unavailing and runs contrary to the third prong of the unjust enrichment test. Scull has not received the benefit of his $121.00 because he, by his own volition, decided not to deposit the refund check. No reasonable trier of fact could come to the conclusion that GCM retained the benefit of Scull's money because Scull elected not to cash the refund, thereby causing GCM to receive the benefit of Scull's $121.00. Indeed, by attempting to return the funds to Scull, GCM did not attempt, in any way, to retain the benefit of Scull's money. Scull, therefore, caused any enrichment of GCM through his own choice and actions. Accordingly, the circuit court was correct in dismissing Scull's unjust enrichment claim.

For all of the reasons stated above, the trial court was legally correct in dismissing each of Scull's three claims with prejudice.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.**