REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 1980
September Term, 2014

ALBERT OLIVEIRA, ET AL.

v.

JAY SUGARMAN, ET AL.

Kehoe,
Berger,
Thieme, Raymond G., Jr.
        (Retired, Specially Assigned),

JJ.

Opinion by Berger, J.

Filed: January 28, 2016

This appeal arises from an order of the Circuit Court for Baltimore City dismissing various claims filed by Albert F. Oliveira and Lena M. Oliveira, Trustees for the Oliveira Family Trust, appellants ("the Shareholders"), for failure to state a claim. Nominal Defendant-Appellee iStar Financial Inc.[1] ("iStar") is a registered Maryland corporation headquartered in New York. Defendants-Appellees include current and former members of the iStar Board of Directors as well as current and former members of iStar's senior management. Jay Sugarman is the Chairman and Chief Executive Officer of iStar and also serves on iStar's Board of Directors. Robert W. Holman, Jr., John G. McDonald, Dale Anne Reiss, and Barry Ridings are current members of the iStar Board of Directors. Glen August, George R. Puskar, and Jeffrey A. Weber are former members of the iStar Board of Directors. Nina B. Matis, R. Michael Dorsch, Michelle M. MacKay, Barbara Rubin, and David DiStaso are current and former iStar executives.[2]

On appeal, the Shareholders presented several issues for our review, which we have consolidated and rephrased for clarity and brevity:

> 1.      Whether the circuit court erred by granting the Appellees' motion to dismiss the Shareholders' derivative claims.
>
> 2.      Whether the circuit court erred by dismissing the Shareholders' claims which were styled as "direct" claims.

---

[1] The company is now known as iStar Inc.

[2] We shall refer to iStar and the Directors collectively as "Appellees."

For the reasons explained herein, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    The 2008 Awards and 2009 Plan**

The alleged wrongdoing in this case centers upon iStar's 2011 modification of restricted stock unit performance awards granted to iStar executives in 2008 (the "2008 Awards"). The 2008 Awards, as originally issued, provided certain employees cash or iStar stock if certain conditions were met. The terms of the 2008 Awards provided that the awards would vest if iStar's stock achieved any one of three average closing price targets over twenty consecutive trading days. The targets were a price of $4 per share by December 19, 2009, $7 per share by December 19, 2010, or $10 per share before December 19, 2011.[3] The total award represented 10,164,000 restricted stock units ("RSUs").

At the time the 2008 Awards were granted, iStar did not have sufficient authorized shares of stock to pay the awards in iStar stock. For this reason, in 2009, iStar sought and obtained shareholder approval of a new Long-Term Incentive Plan (the "2009 Plan"), which increased the number of shares that could be issued for incentive compensation, allowing for issuance of up to 8,000,000 shares of common stock. The terms of the 2008 Awards permitted the awards to be settled in either cash or iStar shares. The awards were to be

---

[3] If the December 19, 2009 goal was attained, the awards would vest in three equal installments. If the 2009 goal was not attained but the December 19, 2010 goal was attained, the awards would vest in two equal installments. If neither the 2009 nor 2010 goals were attained, but the December 19, 2011 goal was attained, the awards would vest in a single installment.

2

settled in shares if the anticipated 2009 Plan was approved by shareholders the following year, or alternatively, if the 2009 Plan was not approved by shareholders, in cash.

In April 2009, iStar filed a Schedule 14A Proxy Statement ("the Proxy Statement") with the United States Security and Exchange Commission. The Proxy Statement included language explaining that "the ongoing financial crisis and its negative impact on our business and financial results have resulted in a sharp decline in [iStar's] share price" which "has led to a more rapid depletion of shares under the 2006 Plan than we had anticipated in 2006," resulting in "virtually no remaining shares available under the 2006 Plan."[4] The Proxy Statement explained that shareholder approval of the 2009 Plan would "ensure that we will have a sufficient number of shares to settle the performance-based awards made in December 2008 using shares of common stock rather than cash." The Proxy Statement further explained that "[i]f the 2009 Plan is not approved by shareholders," the 2008 Awards "will be settled in cash rather than in common stock." The Proxy Statement included language noting that approval of the 2009 Plan would "ensure, for federal tax purposes, the deductibility of compensation recognized by certain participants in the 2009 Plan which may otherwise be limited by Section 162(m) of the Internal Revenue Code."[5] A copy of the 2009

---

[4] The "2006 Plan" referred to a previous long-term incentive plan, which had been adopted in 2006 and made available a maximum of 4,550,000 shares of common stock for awards.

[5] Section 162(m) of the Internal Revenue Code provides that, in certain circumstances, compensation in excess of $1 million to an employee in a year is not deductible by the employer, but contains an exception for the deduction of certain performance-based compensation. IRC § 162(m)(1).

Plan was attached to the Proxy Statement. The 2009 Plan was approved by a shareholder vote in May 2009.

iStar did not achieve the $4 per share target for twenty consecutive trading days by the December 19, 2009 deadline set forth in the 2008 Awards.[6] iStar's stock price also failed to meet the December 19, 2010 deadline. iStar reached the $7 per share target for twenty consecutive days on December 30, 2010, eight trading days after the December 19, 2010 deadline.

Following the near miss of the 2010 target, iStar undertook a six-month process to consider modification of the 2008 Awards. The Board sought to reach a balance "between rewarding management's exceptional performance, as reflected by the 300% rise in the market value of iStar stock, and enforcing the terms of the 2008 Awards in light of the near miss of the $7 price target." After four Board meetings and eleven Compensation Committee meetings, as well as discussions with legal, accounting, and compensation advisors, iStar's Board of Directors modified the 2008 Awards in July 2011 ("the 2011 Modification"). The 2011 Modification converted the 2008 Awards from performance-based to service-based awards. The Modification reduced the amount of the award by 25% and required specific years of service. Pursuant to the 2011 Modification, employees would receive the reduced award in three installments on January 1 of 2012, 2013, and 2014, as long as the employee remained employed by iStar on the vesting dates.

_____

[6] iStar's stock price reached $4 per share in March 2010.

4

According to iStar, the 2011 Modification addressed concerns that key employees would leave iStar for better paying opportunities with competitors and hedge funds if the 2008 Awards resulted in no compensation despite the 300% rise in iStar's stock price. The Board considered forfeiting the 2008 Awards and issuing new awards, but this option was rejected due to the accounting expense associated with issuing new awards.[7]

## B.      The Demand and iStar's Response

In letters dated May 23, 2013 and July 30, 2013, the Shareholders demanded that iStar's Board of Directors "investigate and institute claims on behalf of [iStar] . . . against responsible persons" relating to the 2011 Modification.[8] The Shareholders demanded that the Board of Directors "[r]escind all the shares that were issued under the 2009 Plan to settle the 2008 Awards" or, alternatively, "seek any other appropriate relief on behalf of [iStar] for damages sustained . . . as a result of the Board's misconduct." The demand further sought to "enjoin [iStar] from issuing any more shares under the 2009 Plan to settle the 2008 Awards" and demanded that the Board of Directors adopt internal procedures to "prevent a recurrence of the wrongdoing described" in the demand letter.

On June 28, 2013, the Board formed a committee ("the Committee") to investigate the allegations in the demand letter and make a recommendation to the Board concerning

---

[7] The existing awards had been largely expensed.

[8] The Shareholders' May 23, 2013 letter acknowledged that "the Board certainly had authority to modify the terms of the 2008 Awards, as compensation decisions are entitled to protection of the business judgment rule."

5

the demand. The Committee consisted of a single member, Barry W. Ridings, who was an outside, non-management director who joined the Board in August 2011, after the occurrence of the alleged wrongdoing that was the subject of the demand. Mr. Ridings is the Vice Chairman of Investment Banking at Lazard Freres & Co. LLC ("Lazard"). Lazard had formerly performed restructuring work for iStar in 2010 and early 2011, before Mr. Ridings joined the Board, but had no continuing business relationship with iStar. According to iStar, Mr. Ridings had no business, personal, social, or other relationships with any member of the Board apart from his service on the Board. The Committee retained outside counsel, Joseph S. Allerhand and Stephen A. Radin of Weil, Gotshal & Manges LLP ("Weil" or "Counsel") to assist with the investigation of the content of the Shareholder's demand letter. Weil does not currently represent and has never in the past represented iStar or any of its Board members.

The Committee and Counsel met eight times between July and October 2013, reviewed relevant documents, and conducted multiple interviews. Counsel interviewed three members of iStar management, including Mr. Sugarman, three of iStar's outside, non-management directors, and representatives of Kirkland & Ellis LLP, counsel to the iStar Board's compensation committee, Clifford Chance LLP, iStar's corporate and disclosure counsel, and TowersWatson, an outside consultant to the compensation committee. Following the investigation, on October 23, 2013, the Committee made a presentation to the Board, recommending that the Board refuse the Shareholders' demand. The Board asked

6

Counsel to draft a letter for the Board's consideration, explaining the Board's reasons for refusing the demand.

On November 6, 2013, a draft letter was circulated to the Board. The Board met on November 11, 2013 and, after discussing the draft letter, unanimously determined that pursuing the litigation demanded by the Shareholders would not serve the best interests of iStar and its shareholders. Accordingly, the Board unanimously voted to refuse the demand and directed Counsel to send the letter which had been drafted on the Board's behalf to the Shareholders.

The Board's 10-page letter to the Shareholders explained in detail the reasons supporting the Board's conclusion that the litigation demanded by the Shareholders would be detrimental to the best interests of iStar and its shareholders. Although we do not set forth the letter in full, we summarize several of the reasons set forth by the Board:

- The Board believed that iStar would lose -- and incur attorney's fees pursuing a losing lawsuit -- if it were to seek to litigate the claims alleged in the Shareholders' demand.

- The Board believed that any effort to rescind or stop issuing shares under the 2009 Plan to settle the modified 2008 Awards or to rescind the modified 2008 Awards would harm iStar and its shareholders.

- The Board believed that failure to honor the modified 2008 Awards would create serious morale and retention problems and potentially lead to the departure of key members of management.

7

- The Board believed that the modified awards appropriately rewarded exceptional performance, were necessary to motivate and ensure retention of key personnel, and secured an additional three years of service for a 25% reduction in the original amount of the 2008 Awards.

- The Board believed that failure to honor the modified 2008 Awards would likely embroil iStar in litigation with key members of management, which the key members of management would likely win.

- The Board believed that, even if iStar won in pursuing the claims raised in the Shareholders' demand, there might be no damages because the cost of new grants would exceed the cost of the modified 2008 Awards. The Board explained that the modified 2008 awards saved iStar tens of millions of dollars that would need to be expensed for new awards.[9]

The Board summarized its position by explaining that it saw "no upside -- and much downside -- to the action and lawsuit proposed in the Demand. iStar would probably lose, suffer substantial harm, and pay both sides' attorneys' fees."

## C. Circuit Court Proceedings

On March 7, 2014, the Shareholders filed the complaint giving rise to the instant litigation. Counts I, II, and III are alleged derivatively. Counts I and III allege that iStar

---

[9] The challenged action was the creation of additional stock units through the 2009 Plan. The Shareholders did not challenge the 2008 Awards themselves and, as discussed *supra* in footnote 8, had even acknowledged in a May 23, 2013 that "the Board certainly had authority to modify the terms of the 2008 Awards, as compensation decisions are entitled to protection of the business judgment rule." The Proxy Statement explained that if the 2009 Plan was not approved by shareholders, the 2008 Awards would be settled in cash rather than stock. Accordingly, even if the Shareholders succeeded in invalidating the 2009 Plan, iStar would incur costs associated with replacement executive awards.

8

directors Sugarman, August, Holman, McDonald, Puskar, Ridings, Weber, Josephs, and Reiss breached their fiduciary duties and wasted corporate assets by approving the 2011 Modification. Count II alleges unjust enrichment on the part of the recipients of the awards: Sugarman, DiStaso, Dorsch, MacKay, Matis, and Rubin. Counts IV and V are styled as direct claims. Count IV alleges breach of contract by iStar and the iStar directors named as defendants, and Count V alleges promissory estoppel.

Appellees moved to dismiss the Shareholders' complaint on May 12, 2014. The Appellees contended that all of the claims asserted by the Shareholders were derivative, rather than direct. Appellees further maintained that the Shareholders failed to plead facts sufficient to overcome the presumption that the directors of iStar acted in the best interests of the company, and as such, the Board was entitled to the protection of the business judgment rule. In the alternative, Appellees asserted that even if the court were to reach the merits of the Shareholder's claims, the Shareholders failed to state a claim for breach of fiduciary duty, waste of corporate assets, unjust enrichment, breach of contract, or promissory estoppel. Following a hearing, the circuit court issued a comprehensive memorandum and order dismissing the Shareholders' complaint in its entirety.

This timely appeal followed.

### STANDARD OF REVIEW

We review a circuit court's dismissal of a complaint for failure to state a claim *de novo*. *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 334 (2009) ("We review the grant of

9

a motion to dismiss as a question of law."); *Boland v. Boland*, 194 Md. App. 477, 496 (2010) ("The standard for a circuit court to apply in deciding whether to grant a motion to terminate litigation in a demand refused derivative action is a pure question of law."), *rev'd on other grounds*, 423 Md. 296 (2011).

## DISCUSSION

## I. The Shareholders' Derivative Claims and the Board's Demand Refusal

The parties disagree sharply with respect to the proper analysis to be applied by a reviewing court when considering a board of director's decision in response to a shareholder's demand. Before turning our attention to the specific demand refusal at issue in the instant appeal, we briefly summarize the nature of a shareholder derivative claim and the judicial review applicable to such cases.

The default level of judicial scrutiny applied to review of corporate decisions is the "deferential business judgment rule, which insulates 'the business decisions made by the director from judicial review[.]'" *Boland v. Boland*, 423 Md. 296, 328 (2011) (quoting *Shenker*, *supra*, 411 Md. at 344). The business judgment rule has been described as follows:

> "It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption."

*Id.* (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (citations omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).[10]  The business judgment rule "insulates 'the business decisions made by the director[s] from judicial review.'" *Id.* (quoting *Shenker*, *supra*, 411 Md. at 344).

The shareholder derivative action is "a justifiable, but limited, intrusion upon the general authority of the directors to manage the business affairs of the corporation." *Werbowsky v. Collomb*, 362 Md. 581, 602 (2001).  The Court of Appeals has explained:

> As an exception to the general rule that "the business and affairs of a corporation are managed under the direction of its board of directors[,]" the derivative action is an "extraordinary equitable device to enable shareholders to enforce a corporate right" in certain circumstances.  [*Werbowsky*, *supra*, 362 Md.] at 598–99, 766 A.2d at 133.  "The purpose of the derivative action is to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Shenker*, 411 Md. at 342, 983 A.2d at 423 (quotation marks and citations omitted).  Despite the role given the shareholder, the "corporation is the real party in interest and . . . [t]he substantive claim belongs to the corporation[.]" *Werbowsky*, 362 Md. at 599–600, 766 A.2d at 133 (quoting 13 William Meade Fletcher, et al, *Cyclopedia of the Law of Private Corporations*, § 5941.10 (1995 Rev. Vol.)).  The derivative suit thus balances the interests of the shareholders with those of the corporation and its directors.

*Boland v. Boland*, 423 Md. 296, 327-28 (2011).

___

[10] Maryland courts often look to Delaware law for guidance on issues of corporate law.  *See Shenkner*, *supra*, 411 Md. at 338 n.14 ("This Court has noted the 'respect properly accorded Delaware decisions on corporate law' ordinarily in our jurisprudence.") (quoting *Werbowsky v. Collomb*, 362 Md. 581, 618 (2001).

A shareholder derivative action begins with a demand on the board. Derivative plaintiffs -- here, the Shareholders -- are required to "at the outset, seek a corporate decision on whether to maintain a lawsuit, a prerequisite known as the 'demand requirement.'" *Id.* at 330. The Court of Appeals has emphasized that "[t]he demand requirement *is* important," *Werbowsky*, *supra*, 362 Md. at 618 (emphasis in original), explaining:

> Directors are presumed to act properly and in the best interest of the corporation. They enjoy the benefit and protection of the business judgment rule, and their control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing. Nor should they, or the corporation, be put unnecessarily at risk by minority shareholders bent simply on mischief, who file derivative actions not to correct abuse as much to coerce nuisance settlements.

*Id.* at 618-19.

After receiving a demand from a plaintiff, a board of directors is required to render a decision as to whether the case should proceed. As James J. Hanks explained in his learned treatise, *Maryland Corporation Law*, directors may "after due inquiry, . . . reply to a derivative demand by denying it, letting the stockholder sue and . . . defending their action under the good faith/reasonable belief/ordinary prudence standards of [the business judgment rule]." James J. Hanks, *Maryland Corporation Law* § 7.21[c], p. 276.38 (1995 & 2014 Supp.). When determining whether to pursue the demanded litigation, "a corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation. If the corporation, after investigation, fails to take the action requested by

12

the shareholder, the shareholder may bring a 'demand refused' action." *Boland*, *supra*, 423 Md. at 330 (quoting *Shenker*, *supra*, 411 Md. at 344). This is the stage at which the instant case comes before us on appeal.

"Judicial review of a demand refusal is subject to the business judgment rule, and the court considering a demand refused action limits its review to whether the board acted independently, in good faith, and within 'the realm of sound business judgment.'" *Id.* (internal quotation and citation omitted). The parties disagree, however, as to how the business judgment rule should be applied to the Board's decision to accept or refuse the Shareholders' demand. The Shareholders' position is that, pursuant to *Boland*, *supra*, the Board's decision to refuse the demand is not entitled to a presumption that it was made in good faith and followed reasonable procedures. Instead, the Shareholders maintain that the Board is required to present evidence that it acted in good faith and with reasonable procedures, and the Shareholders are entitled to take discovery regarding these issues. The Appellees' position is that the Board's decision to refuse the Shareholders' demand is entitled to the presumption of business judgment. As we shall explain, we agree with the Appellees.

The Shareholders assert that their position is supported by the decision of the Court of Appeals in *Boland*, *supra*, 423 Md. 296. In *Boland*, the Court of Appeals addressed a demand refusal by a special litigation committee ("SLC"). An SLC is a vehicle employed by a board of directors when there is not a quorum of disinterested directors to respond to

13

a shareholder's demand. *Id.* at 332. *See also Agostino v. Hicks*, 845 A.2d 1110, 1116 (Del. Ch. 2004) ("Even if attempting to obtain the action that the plaintiff desires from the board of directors would be futile because a majority of the directors suffer some disabling interest, the board may appoint a special litigation committee of disinterested directors that may recommend dismissal of the derivative action after a reasonable investigation.") (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779, 785 (Del. 1981)). An SLC is "composed of independent, disinterested directors, either inside the corporation or specially appointed from outside the corporation" and "is vested with the authority to render a corporate decision." *Boland*, 423 Md. at 332. "By isolating the tainted directors and delegating the corporation's decision-making ability to an independent committee, the directors may be able to insulate themselves from a derivative lawsuit. In general, the use of SLCs has spread and is now widely recognized, and it is not disputed that an SLC may recommend termination of a derivative lawsuit." *Id.*

In *Boland*, the Court of Appeals differentiated between judicial review of a board of director's demand refusal and judicial review of an SLC's demand refusal. The Court reaffirmed the general rule that the business judgment rule applies to a board of director's decision to refuse a shareholder's demand. *Id.* at 330. The Court explained, however, that an SLC's demand refusal is an exception to the general rule. *Id.* at 296. The Court held that the SLC's "substantive conclusions are entitled to judicial deference, provided the SLC was independent, acted in good faith, and made a reasonable investigation and principled,

14

factually supported conclusions." *Id.* The Court emphasized, however, that the SLC is "entitled to no presumption regarding the above requirements." *Id.*

The Shareholders assert that the *Boland* standard -- which grants no presumption of independence, good faith, or with respect to the reasonableness of the investigation of the demand -- applies to *all* decisions regarding a shareholder demand, not only to decisions rendered by an SLC. In our view, this is an unreasonable interpretation of *Boland*. Unlike in *Boland*, in the present case, there was no SLC utilized. Director Ridings was selected to investigate the Shareholders' demand, but he was not "vested with the authority to render a corporate decision," which is a requirement for an SLC. *Id.* at 332. Furthermore, the actual decision to refuse the Shareholders' demand was undertaken by the iStar Board of Directors as a whole.

Critically, the iStar Board of Directors consisted of a majority of disinterested and independent directors. It is logical for different standards to apply to judicial review decisions made by a board comprised of a majority of disinterested and independent directors and decisions made by an SLC. An SLC is only formed when a board as a whole lacks disinterestedness and independence. Stricter scrutiny of the corporate decision is appropriate in such situations. Accordingly, the Court of Appeals in *Boland* concluded that, when reviewing a decision of an SLC, the corporation is required to present "some evidence

that the SLC followed reasonable procedures and that no substantial business or personal relationships impugned the SLC's independence and good faith." *Id.* at 340-41.[11]

In this case, the Shareholders' demand was refused by iStar's majority-disinterested and majority-independent Board of Directors rather than by an SLC. Accordingly, the business judgment rule, and not the *Boland* exception, applies to our review.

## II. Whether the Business Judgment Rule Has Been Overcome

Having determined that the business judgment rule is the appropriate framework for our analysis of the Board's decision, we consider whether the business judgment rule has been overcome. As discussed *supra*, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Boland*, *supra*, 423 Md. at 328 (internal quotation and citation omitted). "The burden is on the party challenging the decision to establish facts rebutting the presumption."

---

[11] The Shareholders assert that demand is excused when the majority of a board of directors is conflicted. This is a misstatement of the law. It is well established that an interested board of directors can utilize an SLC to respond to a shareholder demand and avoid the demand being excused entirely. *Werbowsky*, *supra*, 362 Md. at 619 ("[E]ven interested, non-independent directors . . . may choose to seek the advice of a special litigation committee of independent directors, which has become a common practice."). Indeed, demand is excused only in very extreme circumstances. *See id.* at 620 (explaining that demand futility is "a very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are *so personally and directly conflicted* or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.") (emphasis added).

16

*Id.* As we shall explain, the Shareholders have not alleged facts sufficient to overcome the presumption of the business judgment rule.

A. *Allegations regarding the Board's disinterestedness and independence*

We first address the Shareholders' assertion that iStar's Board of Directors was somehow tainted because a majority of the Board at the time of the demand made the decision to amend the 2008 Awards. Only a single member of the iStar Board -- Jay Sugarman -- is alleged to have received the 2008 Awards. The remaining five members of the Board were nothing more than outside, non-management directors of iStar and did not receive any of the 2008 Awards. It is well established that members of a board of directors do not lack disinterestedness "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision." *Werbowsky*, *supra*, 362 Md. at 618. *See also Brehm*, *supra*, 746 A.2d 244, 257 n.34 (Del. 2000) ("It is no answer to say that demand is necessarily futile because . . . [the directors] approved the underlying transaction."). Accordingly, we are unpersuaded by the Shareholders' assertion that the Board's decision was tainted by virtue of the Board's approval of the challenged action.

The Shareholders' allegations with respect to the Board's investigation of the Shareholders' demand are similarly without merit. The Shareholders assert that the Committee's investigation of the Shareholders' demand was rife with improper procedure. The Shareholders argue that Committee member Ridings lacked sufficient corporate experience to make a proper recommendation to the Board and that Ridings was not

17

sufficiently disinterested. Both contentions are baseless. Ridings has forty years of business experience, including service on the boards of several public companies, including the American Stock Exchange. Furthermore, Ridings hired highly respected and experienced legal counsel to assist him and conducted multiple interviews. As the Supreme Court of Delaware has explained, "there is obviously no prescribed procedure that a board must follow" when responding to a demand. *Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991) *overruled on other grounds by Brehm*, *supra*, 746 A.2d 244. The Shareholders' bald allegations of impropriety are plainly insufficient to overcome the presumption of the business judgment rule.

We further reject the Shareholders' contention that Ridings was interested or lacked independence. Ridings joined the Board after the challenged conduct and had no business, personal, social, or other relationships with any other member of the Board. Although Ridings's employer, Lazard, performed banking services for iStar in 2010 and 2011, Lazard has no ongoing business relationship with iStar. Furthermore, "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a directors independence." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

The Shareholders' contention that Ridings lacks independence because he is compensated for his service as a Director is similarly unfounded. *See Werbowsky*, *supra*, 362 Md. at 618 (explaining that directors being "paid well for their services as directors"

18

does not establish lack of independence); *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 576 (Del. Ch. 2015) ("[D]irectors are generally not considered interested . . . simply because [they] receive compensation from the company.") (internal quotation and citation omitted). The Shareholders further contend that Ridings lacks independence because he is a named defendant in this lawsuit. This assertion is contrary to established law. *See*, *e.g.*, *Brehm*, *supra*, 746 A.2d at 257 ("It is no answer to say that demand is necessarily futile because . . . the directors would have to sue themselves, thereby placing the conduct of the litigation in hostile hands . . . .") (internal quotation omitted). Accordingly, we reject the Shareholders' contentions that Ridings was interested or lacked independence.

B. *Allegations that the Board acted in contravention of the authority given by shareholders*

The Shareholders further contend that the Board's refusal of the Shareholders' demand cannot be a reasonable exercise of business judgment because the modification of the performance criteria in the 2008 Awards was a violation of the 2009 Plan. First, we note that the circuit court considered this issue and concluded that "[t]he 2009 Plan support[ed] the Board's authority to make" the 2011 Modification. We embrace the circuit court's cogent analysis on this issue, adopting it as our own. We agree with the circuit court that "Section 3 of the 2009 Plan allows the Board 'in its discretion' to '(i) authorize the granting of the Awards to Eligible Persons; and (ii) to determine the eligibility of Eligible Persons to receive an award.'" We further agree with the circuit court that "Section 19 of the 2009

19

Plan authorizes the Board to 'take any other actions and make any other determinations that it deems necessary or appropriate in connection with the Plan.'" Morever, as the circuit court observed, "Section 13 of the 2009 Plan provides that the Board, 'with respect to any grant, may exercise its discretion hereunder at the time of the Award or thereafter.'"

Turning to the Shareholders' assertion that the 2009 Plan prohibited the Board from taking any actions that would interfere with iStar's ability to claim deductions under Section 162(m) of the Internal Revenue Code, we observe that Section 10 of the 2009 Plan provides that "[t]he Committee, *in its discretion*, may in the case of Awards . . . intended to qualify for an exception from the limitation imposed by Section 162(m) . . . (i) establish one or more performance goals" which must be satisfied prior to vesting. (Emphasis added.) We agree with the circuit court that "[t]his language is clearly discretionary." Moreover, the Shareholders do not cite any provision of the 2009 Plan in support of their assertion that the plan did not permit iStar's Board to modify awards after the awards were granted.

Furthermore, even if we were to assume *arguendo* that the Shareholders are correct that the 2011 Modification was improper, the Board would still be permitted to exercise its business judgment in determining whether pursuing the Shareholders' requested litigation was in the best interests of iStar. In the letter explaining why the Board elected to refuse the Shareholder's demand, the Board explained that even if iStar were to succeed in pursuing the claims raised in the Shareholders' demand, there might be no damages because the cost of new grants would exceed the cost of the modified 2008 Awards. The Board further

20

explained that the modified 2008 awards saved iStar tens of millions of dollars that would need to be expensed for new awards. Accordingly, the Board's decision to refuse the Shareholders' demand was a proper exercise of business judgment, even if we were to assume *arguendo* that the 2011 Modification was improper, because any remedy would be detrimental to the best interests of the corporation.

C. *Allegations that the circuit court improperly considered the substance of the demand letter*

The Shareholders aver that the circuit court erred by considering numerous facts not contained within the complaint. The source of the allegedly inappropriately considered facts is the Board's letter refusing the Shareholders' demand, which was attached to the Shareholders' complaint. The Shareholders maintain that if the circuit court needed to make factual determinations in order to support the dismissal of the complaint, it should have converted the motion to dismiss to a motion for summary judgment and permitted discovery. We are unpersuaded.

Maryland appellate courts have not directly addressed this issue, but Delaware courts are clear that statements contained in a letter refusing demand "must [be] presume[d] . . . to be true absent a particularized allegation rebutting th[e] statement." *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 76 n.24 (Del. 1997), *overruled on other grounds by Brehm*, *supra*, 746 A.2d 244. Furthermore, as discussed *supra*, pursuant to the business judgment rule, the Board's investigation is presumptively reasonable. *See*, *e.g.*, *Bender v. Schwartz*, 172 Md. App. 648, 675 (2007) (commenting on "the presumption that [a board

21

of directors'] investigation [of a demand] was reasonable and its conclusion within the realm of sound business judgment").

The Shareholders urge that, pursuant to *Boland*, no such presumption of reasonableness applies to a board's investigation of a demand, and accordingly, no such presumption of truth should apply to statements contained in a demand refusal letter. As we have explained, see *supra* Part I., the *Boland* exception does not apply here because the demand was refused by iStar's majority-disinterested and majority-independent Board of Directors. Further, the decision to refuse the demand was not undertaken by an SLC. As such, the demand refusal is subject to the protections of the business judgment rule. The application of the business judgment rule to a demand refusal logically includes a presumption that statements within a board's demand refusal letter are true. Accordingly, we expressly adopt the approach of the Delaware courts, and hold that statements contained in a letter refusing demand, when the demand was refused by a board consisting of majority-disinterested and majority-independent directors, are presumptively true absent a particularized allegation rebutting a specific statement.

The Shareholders have not pled any allegations that factually contradict the contents of the demand letter. Rather, the Shareholders and the Board characterize certain facts differently. For example, the Shareholders argue that Ridings was insufficiently experienced and failed to conduct a sufficient number of interviews. The Board responds that Ridings had sufficient experience and that the interviews which were conducted were appropriate.

22

Absent a particularized allegation rebutting a particular statement in the Board's letter, the content of the letter is presumed to be true. Accordingly, we reject the Shareholders' assertion that the circuit court improperly considered various facts found within the Board's letter.[12]

We are further unpersuaded by the Shareholders' assertion that discovery should have been permitted on the issue of whether the Board's refusal of the demand was proper. Pursuant to the Shareholders' argument, the demand requirement would cease to have meaning. A shareholder could evade a motion to dismiss by making a demand, waiting for it to be refused, and then seeking discovery on the demand refusal process. As the Supreme Court of Delaware has recognized, permitting discovery in this context "would be a complete abrogation of the principles underlying the" demand requirement, which is "a recognition of the board's duty to manage the business and affairs of the corporation." *Levine*, *supra*, 591 A.2d at 210. *See also Lerner v. Prince*, 119 A.D.3d 122, 128 (N.Y. App. Div. 2014) ("Were Delaware law to permit discovery in a demand-refused derivative action, it would essentially obviate the directors' authority to decide, under the business judgment

---

[12] As an alternative argument, the Appellees assert that the facts stated in the letter are considered to be part of the complaint pursuant to Md. Rule 2-303(d), which provides that "[a] copy of any written instrument that is an exhibit to a pleading is a part thereof for all purposes." The Shareholders respond that the complaint did not adopt or incorporate all of the factual assertions contained in the letter as true, and that the letter was attached solely for the purpose of alleging rejection of the demand and demonstrating the procedural history. We need not address this issue in light of our adoption of the holding of the Delaware courts that statements contained in the letter refusing demand are presumed to be true absent a particularized allegation rebutting the statement.

23

rule, whether litigation was in the corporation's best interests—the very reason underlying the demand requirement."). Consequently, we hold that the Shareholders were not improperly denied discovery.

Having determined that the Shareholders failed to overcome the presumption of the business judgment rule, we hold that the circuit did not err by granting the Appellees' motion to dismiss the Shareholders' derivative claims. We next turn our attention to the claims styled as "direct" claims.

## III. The Shareholders' Purportedly Direct Claims

In addition to the derivative claims addressed *supra*, the Shareholders assert two claims styled as direct claims: Count IV, which alleges breach of contract by iStar and the iStar directors named as defendants, and Count V, which alleges promissory estoppel. The Appellees maintain that although Counts IV and V are styled as direct claims, they are actually derivative claims, and thus are subject to dismissal for the reasons discussed in Part II. As we shall explain, we agree with the Appellees.

We have explained that "[w]hether a claim is derivative or direct is not a function of the label the plaintiff gives it." *Paskowitz v. Wohlstadter*, 151 Md. App. 1, 10, 822 A.2d 1272, 1277 (2003) (citing *Moran v. Household International, Inc.*, 490 A.2d 1059, 1069-70 (Del. Ch.1985), *aff'd*, 500 A.2d 1346 (Del. 1985); *Elster v. American Airlines, Inc.*, 100 A.2d 219, 223 (Del. Ch. 1953) (quoting *Selman v. Allen*, 121 N.Y.S.2d 142, 146 (1953))).

"Rather, the nature of the action is determined from the body of the complaint." *Id.* (citing *Moran*, *supra*, 490 A.2d at 1070).

A shareholder may sue directly rather than derivatively only when the "shareholder suffers the harm directly or a duty is owed directly to the shareholder." *Shenker*, *supra*, 411 Md. 317, 345 (2009). *See also Bontempo v. Lare*, 217 Md. App. 81, 113, *aff'd*, 444 Md. 344 (2015) ("To maintain a direct action, the shareholder must allege that he has suffered an injury that is separate and distinct from any injury suffered either directly by the corporation or derivatively by the stockholder because of the injury to the corporation.") (internal quotation and citation omitted).

The Court of Appeals has explained:

> In contrast to a derivative action, a shareholder may bring a direct action, either individually or as a representative of a class, against alleged corporate wrongdoers when the shareholder suffers the harm directly or a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation. *Matthews v. Headley Chocolate Co.*, 130 Md. 523, 536, 100 A. 645, 650 (1917) (noting that shareholders may sue directly where "they have suffered some peculiar injury independent of what the company has suffered"); *Waller v. Waller*, 187 Md. at 192, 49 A.2d at 453; *Bender*, 172 Md. App. at 665–66, 917 A.2d at 152; *Danielewicz* [*v. Arnold*], 137 Md. App. [601,] 618 [(2001)]. Cases where direct harm is suffered by shareholders include, for example, actions to enforce a shareholder's right to vote or right to inspect corporate records. That the plaintiff suffered his or her injury in common with all other shareholders is not determinative of whether the injury suffered is direct or indirect. See *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del.2004) (noting that the issue of whether a claim should be brought derivatively or directly turns on

25

considerations of who suffered the alleged harm and who would receive the benefit of any recovery); *Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002) (applying Maryland law) (noting that, in Maryland, where shareholders suffer an injury distinct from that of the corporation, rather than deriving from an injury to the business or property of the corporation, "the corporation lacks standing to sue, and Maryland's 'distinct injury' rule allows shareholders access to the courts to seek compensation directly"). Where the rights attendant to stock ownership are adversely affected, shareholders generally are entitled to sue directly, and any monetary relief granted goes to the shareholder. *Mona* [*v. Mona Elec. Group., Inc.,*], 176 Md. App. [672], 697 [(2007)]; *see also* 13 William Meade Fletcher, Cyclopedia of the Law of Private Corporations § 5939 (2004 Rev. Vol.). If the plaintiff demonstrates that he or she has suffered the alleged injury directly, he or she need not make demand on the corporate board of directors or prove futility of demand, and the business judgment rule does not apply.

*Shenker*, *supra*, 411 Md. at 345.

Having set forth the relevant analytical framework, we look to the injuries allegedly suffered by the Shareholders. With respect to Count IV, the Shareholders allege that "[t]he Company's and the Director Defendants' breach of contract has harmed the [Shareholders] by causing the Company to incur millions of dollars in compensation and tax liability." With respect to Count V, the Shareholders allege that "the Director Defendants' failure to honor the promises that induced [the Shareholders'] approval of the 2009 Plan, [the Shareholders] were deprived of their right to vote with regard to the modification of the 2008 Awards and the Company has been forced to incur millions of dollars in compensation

26

and tax liability."[13] Moreover, the Prayer for Relief seeks recovery for "damages sustained by the Company." Simply put, assuming *arguendo* that iStar wrongfully paid compensation, the entity that was harmed through the payment of improper compensation was iStar, not iStar's shareholders. Accordingly, any claims could only be pursued properly as derivative rather than direct claims. *See Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) (holding that where "the damages allegedly flowing from the purportedly direct claim . . . are exactly the same as those suffered by the corporation in the underlying derivative claim . . . the injury alleged . . . is properly regarded as injury to the corporation and not to the [shareholders]"); *In re Triarc Companies, Inc.*, 791 A.2d 872, 878 (Del. Ch. 2001) ("[W]hatever injury [the shareholder] suffered as a result of the payment of additional elements of compensation to [executives] gave rise to a derivative, not an individual, claim.").

Furthermore, in our view, the Shareholders' reliance upon *Shenker*, *supra*, 411 Md. 317, is misplaced. The Shareholders emphasize that in *Shenker*, the Court of Appeals commented that a direct claim may be brought when a duty is owed directly to a shareholder. 411 Md. at 345. First, we note that *Shenker* was a very fact-specific decision based upon

---

[13] Although the Shareholders include a reference to impaired voting rights in Count V of the complaint, absent is any explanation of how the 2011 Modification actually interfered with Shareholder voting rights. Furthermore, because the Shareholders have not alleged any individual economic harm, the "claim for actual damages, if there is one, belongs to the corporation and can only be pursued by the corporation, directly or derivatively." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 826 (Del. Ch. 2005) *aff'd*, 906 A.2d 766 (Del. 2006).

27

a cash-out merger transaction. *Shenker* involved the unique context of a situation in which corporate directors were exercising "non-managerial duties . . . such as negotiating the price that shareholders will receive for their shares in a cash-out merger transactions, after the decision to sell the corporation already ha[d] been made." 411 Md. at 328. Indeed, we have emphasized "that *Shenker* has a narrow application in the corporate context." *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 197 Md. App. 586, 620 (2011). Moreover, we observe that in *Shenker*, the Court of Appeals emphasized that

> the injury alleged, namely, a lesser value that shareholders received for their shares in the cash-out merger, is an injury suffered solely by the shareholders and not by [the corporation] as a corporate entity. Such an injury, if suffered, is a direct one, separate from any injury suffered by the corporation, thus allowing [the shareholders] to proceed with their direct action against [the board of directors]. A higher or lower price received by shareholders for their shares in the cash-out merger in no way implicated [the corporation's] interests and causes no harm to the corporation.

411 Md. at 346-47. Unlike *Shenker*, the injury alleged by the Shareholders is suffered by iStar as a corporate entity.

Because the Shareholders suffered no injury separate from the alleged injury to iStar, any claim properly belongs to the corporation and can only be pursued by the corporation. Accordingly, the breach of contract and promissory estoppel claims are derivative rather than direct, and were properly subject to dismissal for the reasons discussed in Part II.

Alternatively, assuming *arguendo* the Shareholders could pursue the breach of contract and promissory estoppel claims directly, in our view, there is no merit to either

28

claim. The Shareholders assert that the 2009 Plan constitutes a contract between the Board and the iStar shareholders. The Shareholders maintain that a contract was formed through the Proxy Statement's proposal of the 2009 Plan and the 2009 Plan's subsequent approval by shareholders. We disagree.

"The elements of a contract are offer, acceptance, and consideration." *B-Line Med., LLC v. Interactive Digital Solutions, Inc.*, 209 Md. App. 22, 46 (2012). The Shareholders point to no language in the Proxy Statement or the 2009 Plan which would constitute an offer. Absent any offer, there can be no contract. In support of their claim that a contract was created between the Board and the Shareholders, the Shareholders cite two unreported Delaware opinions: *UniSuper Ltd. v. News Corp.*, C.A. No. 1699-N (Del Ch. Dec. 20, 2005), and *Sanders v. Wang*, C.A. No. 16640 (Del. Ch. Nov. 8, 1999). This Court will not consider unreported opinions for their substance. Maryland Rule 1-104 explicitly provides that "[a]n unreported opinion . . . is neither precedent within the rule of *stare decisis* nor persuasive authority." Indeed, we have commented that our prohibition on the citation of unreported opinions applies even when the jurisdiction in which the unreported opinion was decided permits the citation of unreported opinions. *Kendall v. Howard County*, 204 Md. App. 440, 445 n. 1, 41 A.3d 727 *affd*, 431 Md. 590, 66 A.3d 684 (2013) ("Under Rule 32.1(a) of the Federal Rules of Appellate Procedure, after January 1, 2007, a United States Court of Appeals may not prohibit a party from citing an unpublished opinion of a federal court for its persuasive value or any other reason. However, it is the policy of this Court in

its opinions not to cite for persuasive value *any* unreported federal or state court opinion.")

(emphasis added).  Because the Shareholders have not alleged facts and cited to relevant

authority which would support a finding of the existence of a contract, the breach of contract

claim must fail.

We are similarly unpersuaded by the Shareholders' promissory estoppel claim.  A

promissory estoppel claim requires that the following four elements be satisfied: (1) a clear

and definite promise; (2) where the promisor has a reasonable expectation that the offer will

induce action or forbearance on the part of the promisee; (3) which does induce actual and

reasonable action or forbearance by the promisee; and (4) causes a detriment which can only

be avoided by the enforcement of the promise.  *Pavel Enterprises, Inc. v. A.S. Johnson Co.*,

342 Md. 143, 166 (1996).  The Court of Chancery of Delaware has explained that

descriptive statements in proxy disclosure statements do not amount to a promise for

purposes of promissory estoppel.  *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*,

937 A.2d 760, 805 (Del. Ch. 2007) *aff'd*, 956 A.2d 32 (Del. 2008).  Furthermore, the fourth

element of promissory estoppel cannot be established based upon the Shareholders'

complaint.  The Shareholders have not identified any detriment which can only be avoided

by the enforcement of the 2009 Plan.  Indeed, even if the 2009 Plan had failed to obtain

shareholder approval, the 2008 Awards would have been settled in cash.  Accordingly, the

Shareholders have failed to state a valid claim for promissory estoppel.

30

In conclusion, the Shareholders have failed to surmount the presumption of the business judgment rule. In failing to do so, they have failed to state a claim upon which relief may be granted. Moreover, the remaining breach of contract and promissory estoppel claims are derivative rather than direct, and are properly subject to dismissal. Alternatively, the Shareholders have failed to state a claim for breach of contract or promissory estoppel. Accordingly, we hold that the circuit court properly granted the Appellees' motion to dismiss.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**